THE CAYUGA BRIDGE COMPANY *vs.* MAGEE and others.

The provisions contained in the 2d section of the act of March, 1799, incorporating the Cayuga Bridge Company, prohibiting all other persons from erecting a bridge or establishing a ferry within three miles of the place where the company should erect their bridge, do not extend to the bridge erected by the company across the outlet of Cayuga Lake in 1809; the company having previously, by erecting a bridge across the Cayuga Lake between the villages of East and West Cayuga, located the site of the bridge authorized to be erected by the aforesaid act.

Exclusive privileges contained in a private act of incorporation, which are in derogation of the common law rights of the citizens at large, ought not to be extended by implication.

They must be construed strictly against the company, according to the principles of the common law.

Where the injunction may produce serious injury to the defendant, if the officer allowing the same neglects to take security from the complainant to pay such damages as may be sustained, the defendant may apply to the court for relief.

April 6th.

THE bill in this cause was filed by the complainants, in 1827, to restrain the defendants and their associates from erecting a free bridge across the Seneca river or Cayuga outlet between the north bridge of the complainants and that of the Montezuma Bridge Company, under the act of the 16th of April, 1825. An injunction was granted by the late chancellor, which had suspended the proceedings of the defendants. The cause was now brought to a hearing on bill and answer. The facts in the case are sufficiently stated in the opinion of the court.

*D. B. Ogden & J. A. Johnson,* for the complainants.

*N. W. Howell & J. C. Spencer,* for the defendants.

THE CHANCELLOR. The facts in this case are few and simple; and the cause turns upon the legal construction of the act of incorporating the Cayuga Bridge Company, and the several acts amending the same. The company were incorporated in March, 1797, for the term of 25 years, for the purpose of building a bridge over the Cayuga lake or the outlet

thereof, with a capital of $25,000. (Sess. 20, ch. 59.) But the corporation was to be dissolved if the bridge was not completed within three years from the time of their incorporation. By the act of March, 1799, (sess. 22, ch. 21,) the time for erecting and completing the bridge was extended to the 1st of May, 1801, and the duration of the charter was extended to seventy five years. The second section of that act prohibited any other persons from erecting a bridge or establishing a ferry within three miles of the place where the said bridge should be erected by the company, or from crossing the lake within the same limits without paying toll to the corporation. The eighth section declared that the company should be dissolved if the bridge should remain impassable for 30 days after it was completed ; or, if carried away by the ice if it should not be re-built within eighteen months thereafter. The company erected the bridge across the lake between the villages of East and West Cayuga previous to May, 1801, and kept the same in repair until the spring of 1809, when it was carried away by the ice. After the bridge was destroyed by the ice, it was not re-built until 1813 ; at which time a new bridge was erected on the same site, under the provisions of the act of the preceding year. But shortly after the destruction of the first bridge, the company erected a new bridge over the outlet of the lake about two miles north of the site of the first bridge. In February, 1812, the inhabitants of the counties adjacent to the lake suppossing the corporation had forfeited its charter by neglecting to re-build the bridge at the former site thereof applied to the legislature for aid in erecting a bridge at that place. This application and the remonstrance of the company resulted in a concurrent resolution of the senate and assembly, directing the attorney general to take legal measures to try the validity of the charter rights of the company. Before any effectual proceedings were had under this resolution, a compromise was made between the agent of the company and those petitioners who were more immediately interested in the erection of a bridge across the lake at its former site, which resulted in the act of June, 1812, (sess. 35, ch. 137.) By that act, the company were authorized to add $50,000 to their capital stock, for

*1830.*

Cayuga Bridge
Company
v.
Magee.

1830.

CayugaBridge
Company
v.
Magee.

the purpose of building a substantial bridge across the Cayuga lake on the site of the first bridge. The second section provides that when the said bridge shall he completed, the company shall have, possess and enjoy all the rights, privileges and immunities which were granted to them by the original act of incorporation and the several acts amending the same.; subject to certain restrictions and limitations contained in that section, which do not appear material to the decision of this cause. By the third section of the act, they are authorized to take toll for crossing the bridge over the outlet of the lake, and are bound to keep that bridge as well as the bridge across the lake in repair and to re-build them when carried away or destroyed, under the penalty of a forfeiture of their charter.

The site of the free bridge of the defendants and their associates is more than three miles north of the company's bridge across the Cayuga lake, but it is only a few rods over one mile from their bridge across the outlet. The complainants insist that under the several acts in relation to their company they have the exclusive right to the distance of three miles both ways from each of their bridges; and that no bridge or ferry can be erected or established, and no person can cross the lake or outlet within those distances without paying toll to them for the privilege. On the part of the defendants, it is contended that the exclusive right of the corporation is confined in extent to three miles each way from the place where their first bridge was erected, and where their present bridge across the lake now stands.

If the construction contended for by the complainants is correct, it is evident no free bridge can be erected. The Montezuma bridge is within six miles of the company's bridge over the outlet; and by the ninth section of the act of the 31st of March, 1815, (sess. 38, ch. 120,) no bridge can be built within three miles of the place where the Montezuma bridge is erected. The act of 1825 authorizes the defendants and their associates to erect a free bridge "at a certain point in the vacancy between the bounds or rights included in the respective charters of the Cayuga Bridge Company and the Montezuma Bridge Company, near to and north of the north boundary of the first mentioned charter." This is urged by

the defendants as a legislative construction of the charter of the complainants. I think the legislature did not intend to pass upon the question now in controversy, but to leave it to be settled by the parties, or by the courts. The precise distance between the Montezuma bridge and the bridge of the complainants over the outlet, does not now distinctly appear by the pleadings ; and probably it was not certainly known to the legislature. And by the priviso, the defendants are prohibited from erecting their bridge at any place where the same may violate, or be contrary to the vested rights of either of those companies.

The exclusive privileges contained in the second section of the act of March, 1799, are in derogation of common right, and therefore ought not to be extended by implication. A majority of the supreme court have decided that no person can cross the lake on the ice, within the prescribed limits, without being liable to pay toll to the corporation. (*The Cayuga Bridge Company* v. *Stout*, 7 Cowen's R. 33.) It therefore is the more important that such injudicious grants of exclusive privileges should not be farther extended by construction. The act of 1797 is declared to be a public act, and is to be construed benignly and favorably for every beneficial purpose therein intended. No exclusive privilege was granted by that act ; and it is proper to remark, that no such provision is contained in the acts of 1799 and 1812. So far, therefore, as the two last acts are in derogation of common right, they must be construed strictly against the company, according to the principles of the common law. (2 Mass. R. 146. 4 id. 140. 2 Mod. R. 57.)

It may be proper in the first place to ascertain what were the rights of the corporation under the act of 1799 in relation to this exclusive privilege, and then see how they were altered or affected by the subsequent act. The act of 1797 authorized the company to erect a bridge either across the Cayuga lake, or the outlet thereof. In the act of 1799, the outlet is not mentioned, either in the clause extending the time to complete the bridge, or in that which prohibits persons from crossing without paying toll. Whether the language of this act was changed because the company had de-

1830.

Cayuga Bridge Company.

v.

Magee.

termined to build their bridge across the lake instead of the outlet cannot, probably, be ascertained without referring to the petition on which that act was founded, and other facts not before me on these pleadings. Without reference to this change in phraseology, it is evident the three miles must be reckoned each way from the place where the bridge was first erected across the lake. The language of the restriction is, that it should not be lawful to erect any bridge or establish a ferry within three miles of the place where the aforesaid bridge shall be erected and built by the company. The bridge there spoken of was the bridge across the Cayuga lake, and which was to be completed previous to the first of May, 1801; and the place from which the three miles was to be reckoned was the place where that bridge actually was erected within the time limited for that purpose. The moment the bridge was completed, the legislature had a right to grant a similar privilege to any other person or company, beyond the prescribed limit of three miles each way from that place. But upon the construction contended for by the complainants, if their bridge was destroyed by the ice at any time within the seventy-five years, they were at liberty to build a new bridge at any place between Ithaca and Jack's rifts, and to prevent all persons crossing within three miles thereof without paying toll to them. It is not necessary to decide whether the company was obliged to re-build on the same site, within the eighteen months after the bridge was destroyed. The act of 1812 has rendered that point perfectly immaterial. I am inclined to think the citizens of the state who were prohibited from crossing the lake within three miles of that place, or from building a bridge, or establishing a ferry within those limits, had a right to insist upon the re-building of the bridge at the same place. But if the company were authorized to re-build it at any other place within the six miles, the restricted limits were not thereby extended beyond the three miles north of the place where the first bridge was erected.

There is nothing in the act of 1812 which either expressly or by implication extends the restricted limits beyond what they were under the act of 1799. The original char-

1830.

CayugaBridge
Company
v.
Magee

ter was confirmed by the legislature, on condition that the company should erect a new bridge on the site of the first and should keep not only that bridge, but also the one which they had erected over the outlet, in repair during the existence of their charter. It is evident from the preamble, and from the various provisions of that act, that the legislature only intended to restore the complainants to the privileges which they had probably lost by their neglect to re-build a bridge at the East and West Cayuga villages, and to give them the right to take toll at the bridge erected over the outlet. An extension of the chartered limits to the distance of three miles north of the bridge over the outlet was not necessary for the purposes of the corporation, as they already went a mile beyond the bridge. While the legislature were imposing so many restrictions upon the company as conditions upon which their charter might be confirmed, and when it was deemed necessary to insert an express provision in the third section of the act, permitting them to take toll at the bridge over the outlet, notwithstanding the implied provision in the preceding section, I cannot believe they intended to exend the chartered limits two miles farther in that direction. If such had been the intention of the legislature an express provision to that effect would have been found in the act of 1812. In *Doe* v. *Brandling*, ( 1 Mann. & Ryl. R. 611,) Bailey, J. says : " I consider it an established and highly useful rule in the construction of all acts of parliament of a local and personal nature, to require that the persons soliciting an act of parliament should state in it plainly, distinctly and unequivocally what they mean, in order that the public on the one hand, and the legislature on the other may not be taken by surprise, and may not be left in doubt as to the object and effect of the enactment." By the preamble of the act of 1812, it appears that the provisions thereof were agreed to by the agent of the complainants. They are therefore entitled to no rights which are not expressly granted, or clearly implied in the act.

The result of this opinion is, that the defendants and their associates are authorized to erect the free bridge at the place

wh⬛⬛they had commenced building the same. The injunction must be d⬛solved, and the complainants' bill is dismissed with costs.

I regret that in this case it is not in the power of the court to remunerate the defendants for the loss they have sustained. The injunction has compelled them for a time to suspend their operations, to the great damage of their work which was partially completed ; and much loss must have been sustained by the waste and deterioration of materials. My predecessor understood the rights of the parties different; it was therefore his duty to issue, and continue the injunction. The new rules of the court have provided for cases of this kind hereafter, by requiring a bond from the complainant to pay the damages sustained by the defendant, in consequence of an injunction, if the justice of the case turns out to be in favor of the latter. (Rule 31.) If the officer allowing the injunction neglects to take such bond, in a proper case, the parties liable to be injured by the injunction must make a special application to the court for relief.