THE NEW YORK AND LONG BRANCH RAILROAD COM-
PANY ET AL., PLAINTIFFS IN ERROR, v. ALFRED L.
DENNIS ET AL., DEFENDANTS IN ERROR.

1. An injunction bond conditioned to pay the damages, if it shall be
decided eventually that complainants were not equitably entitled to
such restraining order, is forfeited by a decision of the Chancellor,
dissolving the order and dismissing the bill; provided it is not shown
that such decision was based on some fact arising subsequently to the
granting of such order.
2. The fact of the fairness of the complainant in making the application
for such restraining order does not affect the question.

The action below was in debt on an injunction bond, in the
penal sum of $10,000, dated May 24th, 1873, executed by
the defendants to the plaintiffs, pursuant to chancery rule
46, and as a condition of the granting of a preliminary in-
junction, or restraining order, at the suit of the above named
James T. Easton and James McMahon, against the plaintiffs
in this suit, whereby the latter were restrained from proceed-
ing with the erection of a railroad bridge over the Raritan
river, between Perth Amboy and South Amboy.

The declaration, after reciting the bond and condition,
alleges that such proceedings were had in the injunction suit
that, on the 30th day of June, 1873, the order was discharged,
and that, on the 30th day of December, 1873, the bill was
dismissed, with costs.

The following pleas were filed, viz.: 1. *Non est factum.*
2. That it had not been eventually decided that the com-
plainants were not entitled to the injunction. 3. *Non dam-
nificatus.*

On the trial, the plaintiffs offered in evidence (*inter alia*)—
1. The *injunction bond.* 2. The *restraining order.* 3. The
order discharging the first mentioned order. And, 4. The
final *decree* dismissing the bill in the injunction suit.

At the close of the plaintiffs' evidence, the court ordered a
non-suit, because, in its opinion, the plaintiffs had not offered

any evidence showing that the Court of Chancery had " eventually decided" that the complainants in the injunction suit were " *not equitably entitled* " to the injunction, or restraining order.

Judgment having been entered for the defendants, this writ of error is brought to reverse that judgment, and the non-suit is assigned for error.

For the plaintiff in error, *John W. Taylor.*

## I. The Question.

Was there any evidence that the Court of Chancery had " eventually decided that the *complainants were not equitably entitled to such restraining order,*" within the meaning of the condition of the bond, and of chancery rule 46 ? This rule is as follows :

### Copy of Rule 46.

" In cases where an injunction is granted *ex parte,* the Chancellor or master may, at his discretion, take from the complainant a bond to the party enjoined, in such sum as may be deemed sufficient, either with or without sureties, conditioned to pay to the party enjoined such damages as he may sustain by reason of the injunction, *if the court shall eventually decide that the complainant was not equitably entitled to such injunction; such damages to be ascertained in such manner as the Chancellor shall direct.*"

It is to be borne in mind that the last thirteen words of the rule, concerning the mode of ascertaining the damages, are *omitted in the condition of the bond in question.* The consequence is, that the Court of Chancery had no jurisdiction to direct a reference or other proceeding in that court for ascertaining the damages. *Garcie* v. *Sheldon,* 3 *Barb.* (*S. C.*) 232; *Higgins* v. *Allen,* 6 *How. Pr.* 30; *Easton* v. *N. Y. & L. B. R. R. Co.,* 11 *C. E. Green* 359.

(The decision in the last mentioned case was on an application for the delivery of the bond in question, and it was

held that the question of liability on the bond was "purely a matter of common law cognizance," and that whether the condition of the bond had been broken or not, must depend on the judgment of the court in which the action thereon is instituted.)

### 1. *Origin of Rule* 46.

The rule was adopted and promulgated since the year 1850, and substantially copied from rule 31 of the New York Court of Chancery, the material portion of which reads as follows :.

"The Vice-Chancellor or master who allows an injunction out of court, under the authority conferred on him by the thirtieth rule of this court, shall take from the complainant, or his agent, a bond to the party enjoined, in such sum as may be deemed sufficient, and not less than $500, either with or without sureties, in the discretion of the officer allowing the injunction, conditioned to pay to the party enjoined such damages as he may sustain by reason of the injunction, *if the court shall eventually decide that the complainant was not equitably entitled to such injunction; such damages to be ascertained* by a reference to a master, or otherwise, *as the Chancellor* or Vice-Chancellor having jurisdiction of the cause in which such injunction issued *shall direct."    N. Y. Chancery Rules* (*ed.* 1844,) *p.* 40.

The New York rule "was framed by Chancellor Walworth in 1830, and by him made, for the first time, a rule of court." *Leavitt* v. *Dabney,* 2 *Sweeney* 617, (1870); *Cayuga Bridge Co.* v. *Magee,* 2 *Paige* 121, (1830.)

### 2. *Occasion and Object of the Rule.*

In *Leavitt* v. *Dabney, ubi supra,* (1870,) the court, in referring to the adoption of the rule, say :

"He [the Chancellor] was undoubtedly led to the adoption of the rule by his conviction of the want of power in the court to give an injured defendant any indemnity ; and, as Vice-Chancellor and masters in chancery, whose offices were created under the constitution of 1821, were empowered

New York and Long Branch R. R. Co. v. Dennis.

to grant *ex parte* injunctions, it may have been thought that the discretion of those officers might sometimes be unsoundly exercised. After the incorporation of this rule into the system of equity practice, its observance was strictly enforced by the Chancellor, which illustrates its importance in his eyes."

In the case of *Cayuga Bridge Co.* v. *Magee,* 2 *Paige* 116, (1830,) cited above, the injunction (granted by Chancellor Walworth's predecessor) had suspended the proceedings of the defendants in the erection of a bridge across the Seneca river, and they had sustained serious loss in consequence of the injunction. The case came before the new Chancellor (Walworth) on bill and answer, &c., and in dissolving the injunction and dismissing the bill, the Chancellor observes:

"I regret that, in this case, it is not in the power of the court to remunerate the defendants for the loss they have sustained. The injunction has compelled them for a time to suspend their operations, to the great damage of their work, which was partially completed, and much loss must have been sustained by the waste and deterioration of materials. My predecessor understood the rights of the parties differently, and it was therefore his duty to issue and continue the injunction. *The new rules of the court have provided for cases of this kind hereafter, by requiring a bond from the complainant to pay the damages sustained by the defendant in consequence of an injunction, if the justice of the case turns out to be in favor of the latter.*" (*Rule* 31.)

Again, in *Loveland* v. *Burnham,* 1 *Barb. Ch.* 66, (1845,) the Chancellor says:

"Although the thirty first rule fixes the minimum of the penalty of a bond to be taken by the officer allowing an injunction out of court, it was intended that such officer should exercise a reasonable discretion in fixing the amount of the security to be given, and that it should in all cases be sufficient to cover the amount of damages the defendants might sustain, if *it should eventually appear that the allegations of the bill were untrue, or that, for any other reason, the complainant was not entitled to an injunction.* \* \* *The object*

New York and Long Branch R. R. Co. v. Dennis.

*of the rule was to afford to the party enjoined full and ample security for all damages he might sustain, by reason of the allowance of an injunction against him, without giving him an opportunity to be heard in opposition to such allowance."*

Still again, in *Sullivan* v. *Judah,* 4 *Paige* 444, (1834,) the Chancellor remarks as follows:

" In this case the master had the power to allow the injunction, as it did not appear from the bill that the injunction must necessarily produce great and irreparable injury to the defendants. *It was one of those cases, however, in which, if there had been equity in the bill to support an injunction,* the master should, in the exercise of a sound discretion have required security from the complainant, under the last clause of the thirty first rule, before he allowed the injunction."

Also, in *Carroll* v. *Sand,* 10 *Paige* 298, (1843,) the same Chancellor observes:

" The object of allowing the injunction master to dispense with sureties in certain cases, was to enable the complainant to give his own bond where his personal responsibility, in the opinion of the officer allowing the injunction, would, in the class of cases there specified, afford ample protection to the defendants. *In other words,* that the master might accept a bond without sureties, where the complainant himself was worth more than double the amount of the damages which the defendant would probably sustain by reason of the injunction, *if the complainant should fail in sustaining it."*

In *Edwards* v. *Bodine,* 11 *Paige* 223, (1844,) the Chancellor, again referring to the rule, says:

" The rule was intended to protect the defendant against any injury he might sustain by the allowance of an injunction ; whether the injunction was erroneously granted by the officer of the court, where the case made by the bill did not warrant its being issued, or was properly allowed by the officer, but upon partial or erroneous statement of the real facts of the case ; and the object of the court in requiring a bond in such cases will be best effected by giving to the language of the condition of the bond its natural sense."

### 3. *Construction of the Rule.*

1. The "*mischief*" which the rule was designed to remedy, is shown by the case of *Cayuga Bridge Co.* v *Magee,* 2 *Paige* 116, *supra,* which, doubtless, suggested and *occasioned* the rule.

The injunction in that case was granted *ex parte* by the Chancellor himself, on the filing of the bill, in 1827, and the cause having been brought to a final hearing on bill and answer alone, a decision was rendered April 6th, 1830, to the effect " that the defendants and their associates were author-ized to erect a free bridge at the place where they had com-menced building the same."

The case was very much like the present. The defendants had partially completed their bridge over Seneca river, and their operations were suspended by the preliminary injunction for more than two years, " to the great damage of their work," and " much loss must have been sustained by the waste and deterioration of materials."

The bill was filed in good faith, and the case " turned upon the legal construction of the act incorporating the Cayuga Bridge Company, and the several acts amending the same."

After a final hearing upon the merits, the injunction was dissolved, and the bill dismissed, with costs, the Chancellor expressing his regret that he could not (owing to the fact that no bond had been required when the injunction issued) " re-munerate the defendants for the loss they had sustained," but stating, at the same time, that " the new rules of the court had *provided for cases of this kind hereafter,* by requiring a bond from the complainant to pay the damages sustained by the defendant in consequence of an injunction, *if the justice of the case turns out to be in favor of the latter,*" referring to rule 31.

It is evident from the language of the Chancellor who made the rule, that the word " *equitably* " has no peculiar significance in this connection, and that it means about the same as "*justly* "—or according to the "*justice of the case.*"

2. It is apparent, too, that the rule was intended to throw any loss or damage, caused by a preliminary *ex parte* injunction, upon the *complainant*, instead of the *defendant*, if, upon a final hearing, the court should decide that, *according to the principles of equity* applicable to and regulating the use of this process, the complainant was not entitled to it.

3. The case of *Loveland* v. *Burnham*, 1 *Barb. Ch. Rep.* 65, (1845,) contains language pointing to the same conclusion. In his opinion in that case, Chancellor Walworth says that the bond should be sufficient to cover all damages the defendants might sustain, "if it should *eventually appear that the allegations of the bill were untrue*, or that, *for any other reason, the complainant was not entitled to an injunction.*"

"The object of the rule was to afford the party enjoined full and ample security for all damages he might sustain, by reason of the allowance of *an injunction* against him, *without giving him an opportunity to be heard in opposition to such allowance.*" *Carrol* v. *Sand*, 10 *Paige* 298; *Sullivan* v. *Judah*, 4 *Paige* 444 (1834); *Edwards* v. *Bodine*, 11 *Paige* 223 (1844.)

4. In *Barbour's Chan. Prac.*, *p.* 622, the author, who was the Chancellor's clerk, (see New York Chancery Rules,) in giving the rule omits the word "*equitably*," probably because not having any peculiar significance or qualifying effect.

Section two hundred and twenty two of the New York Code, (enacted after the abolition of the Court of Chancery,) embodies the rule referred to, omitting the word "*equitably*," and substituting the word *finally* for "*eventually*," so as to read: "*if the court shall finally decide that the plaintiff was entitled thereto.*" *Leavitt* v. *Dabney*, 2 *Sween.* 617; *Lawton* v. *Green*, 64 *N. Y.* 326.

5. It has never been supposed that this language of the code is different in meaning and effect from that of the old chancery rule.

The word "finally" in the code has the import given by judicial construction to the word "*eventually.*"

Says the court, in *Dunkin* v. *Lawrence*, 1 *Barb. S. C.*

New York and Long Branch R. R. Co. v. Dennis.

*Rep.* 448, (1847,) "the word *eventually*, as used in the rule, and in the condition of the bond, relates to the *final decision* upon the equity of the bill itself."

An examination of the New York cases referred to, will show conclusively—

*First.* That the *decision* contemplated by the rule is the *decree* finally or "eventually" made in the cause, whereby the injunction or injunctive order is dissolved or denied and the bill dismissed, after a hearing, either upon the pleadings alone or upon the pleadings and proofs.

*Second.* That it has never been held or thought necessary, in order to entitle the obligee to enforce the bond, that any inquiry should be instituted or an order made, in respect to the circumstances of fairness or unfairness, propriety or impropriety, *bona fides* or *mala fides*, connected with the application for the preliminary injunction; but—

*Third.* That the decree so "eventually" made on the merits, denying the injunctive relief prayed for, and dismissing the bill, is appropriate, competent and conclusive evidence that the party obtaining the preliminary injunction was "not equitably entitled" to it.

6. The construction thus uniformly and always given to the rule by the court that framed and adopted it, must have been known to our Court of Chancery when that rule was borrowed and adopted here, (subsequently to 1850,) and it must be presumed to have been adopted *with the meaning so affixed to it* by judicial construction.

This is a canon of interpretation as to borrowed statutes and constitutional provisions, and it is equally applicable to court rules, which are also laws of the land. *Cooley's Con. Lim.,* (*3d ed.*) 53, *and note* 1; *Sedgwick on Con. of Stat., &c.,* (*2d ed.*) 367, *and note.*

The *final* decision on the merits, after a full hearing, is thus made the criterion of the title or right of the complainant to an injunction; and the object of the rule is to compel the complainant, when he asks for a preliminary or provisional injunction, and as a condition of its being granted, to indemnify the

defendant against any damage accruing to him from such an injunction, if, by the final decision upon all the facts and · upon the law, it should appear that the complainant had no title or right to it.

7. But independently of this historical view of the rule and the construction given to it in the state where it originated, and from which it was borrowed, it is manifest, from a consideration of the terms of the rule, that no other construction can be fairly given to it.

*First.* The expression " equitably entitled," when fairly and fully considered, will appear to have no reference (except, perhaps, incidentally,) to the motive or spirit of the applicant, or to the manner or circumstances of the application, for the interposition of the strong arm of the court.

If the facts and law should warrant the injunction, the complainant would be " equitably entitled " to it, although his motive in asking for it might be reprehensible; and, however praiseworthy his motive might have been, yet, unless it were warranted by the law and the facts, he would not be " equitably entitled " to the writ.

Besides, the term " entitled " cannot relate or apply to a preliminary, *ex parte* injunction. However strong, well sustained and *bona fide* the application for a preliminary injunction may be, it furnishes no *title* or right to such process, " equitable " or otherwise, for a preliminary injunction is *always* a writ of *grace* and *never of right.*

" The right to a preliminary injunction is not *ex debito justitiæ,* but the application is addressed to the sound discretion of the court, to be guided according to the circumstances of the particular case." *High on Injunc., p.* 8, § 11; see, also, *Hill. on Injunc.,* (3d ed.) 20, § 18.

That a preliminary injunction is not a matter of right—a process to which the complainant is " entitled "—is clear, from the fact that the court is in the habit of *imposing terms and conditions* when it decides to issue it.

*Second.* The word " equitably " is evidently used in contradistinction to the word " legally," and in connection with the

word " entitled," means that the party must have an *equitable title* or right, *i. e.,* such a right or title as a court of equity recognizes and protects.

Hence the omission of the word *equitably* in embodying the old New York chancery rule thirty one in the code, as above noticed, after the establishment of one tribunal, and one mode of procedure, for the administration of both law and equity.

Is it at all *supposable* that the learned Chancellors of New York and New Jersey, who, one after the other, adopted the rule in question for regulating the administration of equity jurisprudence in their respective courts, intended the words " *equitably entitled,*" *to be understood in any other than their technical sense ?*

*Third.* Again, if (as I think has been shown,) the words " equitably entitled " are equivalent to *possessed of an equitable title* or *right,* then it would seem to follow that they do not relate to the motive, manner or conduct of the party applying for the injunction, *but to his title or right* thereto, as shown by the evidence, and as settled by the final decision.

*Fourth.* What is the real object of the rule ?

Undoubtedly, *compensation or indemnity to the party enjoined,* for damage occasioned to him by the injunction, when it ultimately appears that the party invoking it was not equitably entitled to it.

Therefore the injunction bond is made to the "*party enjoined.*"

*Fifth.* If the party enjoined has no right of action on the bond, except in cases where, in connection with a want of probable cause, the conduct of the complainant has been *mala fide,* reckless and malicious, he is not much (if at all) benefited by the bond, for under those circumstances, after the final decision in his favor, he would have a right of action for malicious prosecution. *High on Injunc.,* § 955 ; *Cox* v. *Taylor's Adm'rs,* 10 *B. Mon.* 17.

*Sixth.* The words " such injunction," in both the New York and New Jersey rule, evidently mean an *injunction in such cause.* The cases and authorities referred to show that to be

the practical construction. The rule is intended to make the party who invokes the strong arm of the court in his behalf responsible for the damage caused to the party enjoined, by the operation of the injunction, before the final decision of the cause on the merits. *Hill. on Injunc.*, (3d ed.) p. 92, § 40; *High on Injunc.*, § 946.

The case of *Smith* v. *Kuhl*, 11 C. E. Green 97, seems to hold a doctrine at variance with that herein maintained, and having abundance of support in the authorities. In that case there was a provision in the condition of the bond for an ascertainment of the damages, under the direction of the Chancellor, and the decision was on an application for an order directing such ascertainment.

No authority was cited by the learned Chancellor in support of the view held by him, unless *Dodd* v. *Flavell*, 2 C. E. Green 255, was referred to for the purpose. That, as stated by the Chancellor, was the case of an application after answer filed, and an unsuccessful motion to dissolve the injunction for an order requiring the execution of a bond by the complainant. The order applied for was refused because, in the opinion of the court, the bill showed a clear right and an infraction thereof, and the case made by the bill had not been essentially altered by the answer and proof of the defendant. It may be observed that an application for an order requiring a bond to be given, and an application for leave to prosecute the bond, when forfeited, are obviously quite different.

In this same case (*Dodd* v. *Flavell*,) it will be seen that Chancellor Green, after refusing the application for a bond, promised that if the complainant was guilty of laches, he would either dissolve the injunction *or require the complainant to give a bond*.

He evidently thought that the bond, if given as promised, in the contingency referred to, would not be entirely illusory, but of real value to the defendant, and yet there was no suggestion or suspicion of unfairness, or *mala fides*, on the part of the complainant, in connection with the application for the injunction in that case.

In conclusion, I will refer to *Hill. on Injunc.*, (3d ed.) *ch. 2, pp.* 73–102; *High on Injunc.*, § 946 *to* 981; and the numerous cases cited in the notes.

For the reasons stated, I submit that the judgment of non-suit was erroneous and should be reversed.

For the defendants in error, *John P. Jackson.*

(*A.*) The condition of the bond sued on was based on the event that the Court of Chancery should eventually decide that the complainants were not equitably entitled to the restraining order. The New Jersey rule is, that the mere dissolution of an injunction, whether before or after answer, is not of itself evidence that the party applying for it was not equitably entitled to it. *Smith* v. *Kuhl,* 11 *C. E. Green* 97; *Easton & McMahon* v. *The L. B. R. R. Co.,* 11 *C. E. Green* 359.

And this was the only evidence offered by the plaintiffs. No bad faith or disingenuous conduct in applying for the injunction was charged against the complainants in the chancery suit.

(*B.*) The alleged contrary rule in other states cannot affect our courts, for—

(1.) The Chancellor is invested with the right to make rules, (see ordinance establishing the Court of Chancery, printed in 4 *C. E. Green* 580.; see also *Gannon* v. *Fritz,* 79 *Penn. St.* 303;) he must have the power to declare their meaning. A rule of court may be controlled by a change of the words used therein, or by a decision of the court that the words shall be taken to mean a certain result. *Squires* v. *Millett,* 31 *Iowa* 169.

And no appeal will be entertained from such decision. *Mix* v. *Chandler,* 44 *Ill.* 174; *State* v. *Smith,* 44 *Mo.* 112.

It matters not what language is used if the meaning be clearly communicated; it is a question with respect to the intendment of the Court of Chancery. Compare remarks in *Douglass, Receiver,* v. *The State,* 5 *Vroom* 487. So in law of contracts. 2 *Parsons on Contracts* 51, *note b; Hinton* v. *Locke,* 5 *Hill* 437. Hence its declaration of the meaning of a rule becomes a part of the rule itself.

(2.) The construction given by the New Jersey Court of Chancery to the forty sixth rule of that court, respecting in-·junction bonds, is supported by the system of jurisprudence which regulates the granting of injunctions.    *Dodd* v. *Flavell*, 2 *C. E. Green* 255; *Smith* v. *Kuhl, supra; Easton & Mc-Mahon* v. *N. Y. & L. B. R. R. Co.*, 11 *C. E. Green* 359; *Green* v. *The Phila. Freestone and Granite Co.*, 11 *C. E. Green* 443.

For the Chancellor only requires such bonds *at his discretion;* there is no obligation to protect the enjoined party.    See the rules.    No absolute right exists in favor of the party enjoined.    See illustrations under *F, infra.*

(*C.*) A greater freedom and ability to do justice to both parties exist where a Chancellor may require a bond which shall not necessarily be forfeited, if investigation results in a dissolution of the injunction.

The practice of requiring bonds on granting injunctions is comparatively new in this state, and no necessity can be alleged to adopt more stringent rules than the Chancellor has adopted.

Elsewhere, the practice on requiring security upon the granting of injunctions differs.

Generally, in the United States, the subject is regulated by statutes of different states.    *High on Injunc.*, § 946; *Hill. on Injunc., p.* 72.

In New Hampshire the bond is absolute " to pay all damages occasioned by the injunction," &c.    *Derby Bank* v. *Heath,* 45 *N. Hamp.* 524; 38 *Ib.* 612.

In Massachusetts the same rule prevails.    2 *Daniell's Ch. Pr.* 1666, *note* 2.

In Alabama the practice is nearer that of New Jersey. *Garrett* v. *Logan*, 19 *Ala.* 344.

The United States National Courts followed the old English chancery practice.    Chief Justice Taney, in 1851, says, in *Bein* v. *Heath*, 12 *How.* 179, " *they exercise a sound discretion* in requiring a bond or not, prescribing both principal and

condition; *the established principles of equity permit any sort of a bond to be required."*

The English practice, since about 1844, has almost universally required a bond. *Chappell* v. *Davidson*, 8 *D., M. & G.* 2; *Novello* v. *James*, 5 *D., M. & G.* 876; *Kerr on Injunc.* 212, 621–2; *Joyce on Injunc.* 130, &c.

But not invariably, *e. g.*, a clear case of fraud in publishing a periodical. Ingram *v.* Stiff, reported in note to *Turk* v. *Silver, Johns. (Eng.) Ch.* 220.

*Adamson* v. *Wilson*, 3 *N. R.* 368; 10 *L. T. (N. S.)* 124; 2 *Joyce on Injunc.* 1308. And this agrees with the New Jersey system. *Dodd* v. *Flavell*, 2 *C. E. Green* 255. The whole matter of terms in granting or continuing an injunction is in the discretion of the court. *Henwood* v. *Jarvis*, 12 *C. E. Green* 254.

And in general the power of a court of equity to require an undertaking as to damages consequent upon any order, is fully recognized, *e. g.*, on *not issuing* an injunction, an undertaking is sometimes required from *defendant*. *Joyce on Injunc.* 1308; *Bramwell* v. *Holcomb*, 3 *M. & C.* 737–9; *Kerr on Injunc.* 212, &c. And after the court had *refused* an injunction in the case of *The Proprietors of Bridges, &c.,* v. *Hoboken L. and I. Co.*, 2 *Beas.* 81, it was intimated that if complainants *desired to appeal*, an injunction would be granted on satisfactory bond given by them.

(*D.*) The construction contended for by plaintiff in error, that the mere dissolution of the injunction and dismissal of the bill constitute a breach, is open to the objection that damages would be required in cases where good grounds existed for the obtaining of an injunction, which were removed pending the suit. *Payne* v. *Wallace*, 6 *Mon.* 381; *High on Injunc.*, p. 565, § 980, &c.

(*E.*) The Chancellor's construction is preferable, because he may take a bond without prejudice to either side. It aids the court to abstain from expressing an opinion upon the merits of the case until the hearing. Vice-Chancellor Kin-

dersley, in *Wakefield* v. *Duke of Buccleuch*, *Jur.* (*N. S.*) 1865, 523.

(*F.*) The propriety of the New Jersey construction of the rule, not to allow the mere dissolution of the injunction or dismissal of the bill to be a groundwork for damages, is well illustrated by a large class of cases, and especially by the *case in hand*. See 9 *C. E. Green* 49 *and* 59. The suit was in the name of the attorney general, who argued the case, and even asked for a re-hearing. The Chancellor also says "*the merits of the case were very fully and ably discussed, and presented and received a very full and deliberate consideration;*" this negatives fraud or bad faith.

See also the case of *Attorney General* v. *Pat. & Hud. R. R. R. Co.*, 1 *Stockt.* 526, in Court of Errors, case of alleged permanent injury to navigation of Passaic river at Acquackanonk, both sides interested in obtaining a correct view, (*p.* 562.) In this case, after much consideration, a temporary injunction, to try facts as to location and structure, was *advised* by the Court of Errors, overruling the Chancellor. "It is important in cases where obstructions to public navigation are about to be erected, and which, when erected, can only be removed at great expense and sacrifice, that the court should exercise a preventive remedy by injunction." (See cases referred to in the opinion of this case. Right to an injunction considered.)

*State of Penn.* v. *Wheeling Bridge Co.*, 13 *How.* 518, is a memorable case to show the importance of the early exercise of the preventive remedy, when otherwise relief could be obtained only with great expense and sacrifice.

The order there was to abate the bridge unless remedied.

And Judge Grier, in the Newark bridge cases, says: "If there be a *prima facie*, or even doubtful case shown, it is the interest of *both parties* that the interlocutory injunction should issue." *Milner* v. *N. J. R. R. Co.*, 6 *Am. Law Reg.*, (1858,) *p.* 7.

Read *Cooley on Const. Lim.*, *p.* 592, ¶ 3, to show the duties devolving on courts in determining legality of bridges over

navigable rivers, or questions arising upon construction of charters.

To restrain the assertions of *doubtful* rights in a manner productive of irreparable damage, and to prevent injury from the doubtful title of others, are among the legitimate functions of a court or eqity. *Story's Eq. Jur.,* § 872; *Mitford's Pl.* 5; *Henwood* v. *Jarvis,* 12 *C. E. Green* 254; *Attorney General* v. *Hudson R. R. Co.,* 1 *Stockt.* 526. Hence a person may be equitably *" entitled"* to an injunction.

Besides *Navigation* cases, the New Jersey rule works well in *Fraud* cases. *Henwood* v. *Jarvis,* 12 *C. E. Green* 247; *Hoagland* v. *Titus,* 1 *McCarter* 81; and *Discovery* cases, *Robinson* v. *Davis,* 3 *Stockt.* 302.

And in bills for *Specific Performance. Huffman* v. *Hummer,* 2 *C. E. Green* 263; *Camden and Amboy R. R. Co.* v. *Stewart,* 3 *C. E. Green* 489.

Also, in cases of attempts to becloud titles. *Morris Canal* v. *Jersey City,* 1 *Beas.* 227, 545. Questions of large importance not free from doubt, and both parties interested.

Also, doubtful questions as to the invasion of railway franchises. *M. & E. R. R. Co.* v. *Hudson Tunnel Co.,* 11 *C. E. Green* 295. Or of fishery privileges. *Britton's Adm'r* v. *Hill,* 12 *C. E. Green* 389.

And in cases of questions as to legal constructions and proper interpretation of the grants of *mining* rights. *Boston Franklinite Co.* v. *N. J. Zinc Co.,* 2 *Beas.* 215; *Firmstone* v. *Decamp,* 2 *C. E. Green* 309.

In all the above cases a bond might properly be demanded, which might be enforced to secure *costs,* and a guaranty of good faith and truthfulness, but not to pay for all *damages,* if the party honestly invoked a legal decision.

(*G.*) The main reliance of the plaintiff in error is upon the argument drawn from the New York practice. But this rule and its history differ from ours. By the rules in chancery of New York, published in 1829, it was ordered that injunctions might be ordered on the certificate of Vice Chancellors or injunction masters, (rule 30,) of whom a number existed. By

rule thirty one, published in 1837, it was required that injunctions in certain (important) cases should be made on direct application to the Chancellor or Vice Chancellor, " and in any case, where no special provision is made by law as to security, the officer allowing an injunction may, in his discretion, require of the complainant or his agent, a bond with security,. or his own bond only, to the party enjoined, in such sum as may be deemed reasonable, conditioned to pay such party all damages he may sustain by reason of the injunction."

It will be noticed that the present New York rule did not restrict or limit the Chancellor *himself*, but was addressed to his subordinates.

It was to guide their discretion, which it is intimated may have been " sometimes unsoundly exercised." *Leavitt* v. *Dabney*, 2 *Sweeney* 617. The court was not thereby shorn of its original jurisdiction, or curtailed in power.

(*H.*) The phraseology of the New Jersey rule indicates that the question of forfeiture depended on the prior question whether a complainant was equitably entitled to the injunction *at the time it was solicited,* for it provides only for *ex parte* applications. In cases where both parties appear, the equities of both may be considered at the time. This would seem to indicate that the special object of the rule was to secure good faith *in the application ;* not an insurance of ultimate success. *Smith* v. *Kuhl, supra.*

(*I.*) Again, the poorest citizen is as much entitled to ask for the injunction remedy as any other, but he cannot secure bonds liable to the construction contended for by the plaintiff. He can obtain guaranties for his good faith and truthful representations, but not for large pecuniary risks. So here, as in the other cases mentioned, the court would be confined to a dilemma, viz., a denial of justice in refusing the writ, or a denial of justice in waiving the requirement of a bond to secure good faith and truthfulness.

II. The Supreme Court, or this court, will adopt the con-

-struction put by the Chancellor on the rules in chancery. The reasons are obvious—

(1.) Rules are made for the safe and orderly conduct of the business of the court; they may be repealed or modified, and therefore explained and controlled by the court that makes them.

(2.) Proper respect for that tribunal requires this; any opposite course would result in mere verbal criticism, one court holding one way and the other another. *Gannon* v. *Fritz,* 79 *Penn. St.* 303; *Squires* v. *Millett,* 31 *Iowa* 169; *Mix* v. *Chandler,* 44 *Ill.* 174; *State* v. *Smith,* 44 *Mo.* 112.

III. All parties to an injunction bond in chancery are presumed to contract with a knowledge of the usages and practice of that court. Therefore we resort thither to learn the meaning and intent of the parties to this bond, to ascertain which is the object of the court.

Whether or not the construction given by the Court of Chancery to its rules is that which this court would give in the first instance, is not our present inquiry.

Our first inquiry is, *what was the intention* of the parties to this bond?

Their intent was governed by the *" known usages"* of the Court of Chancery, which are gathered from the reported decisions as well as the rules. *Walker's Amer. Law,* § 217, *p.* 659, (6th ed.)

The view of the court, announced from time to time to -suitors therein, was all the same as incorporated into the bond; its construction is of course governed by recitals, (*De Colyer on Guaranties* 254; *Peppin* v. *Cooper,* 2 *B. & A.* 431,) .and to change the liability by a change of decision as to the meaning of the rule, would entrap these sureties.

In practical effect it would be equally as unjust as for a legislature to attempt to change the meaning of a contract.

The law at the time the bond was given governed its con-.struction. *Story on Cont.,* § 1384.

A change of construction in this manner might ruin sureties.

The construction given by the Chancellor of New Jersey to this rule had become a part of the law of the state. These defendants, and citizens generally, acted in reliance upon it—counsel would advise clients accordingly. In such a case it is better that the correction of the error, if any, should be left to operate on future cases only, lest unjust consequences should ensue, and a new wrong be committed. *Cooley on Const. Lim.* 53.

For these reasons, I submit that the judgment of non-suit was correct, and should be affirmed.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. This case comes before this court under the following circumstances: The New York and Long Branch Railroad Company, the plaintiff in error, was defendant in a suit in chancery, brought in the name of the attorney general, on the relation of Easton and McMahon calling in question the right of such company to erect a bridge over the Raritan river, at Perth Amboy. That case is reported in 9 *C. E. Green* 49. Upon the filing of that bill the Chancellor granted a restraining order, and required a bond, which was executed by the defendants in this suit, the condition of which was in the words following, to wit: " Now, therefore, the condition of the above obligation is such, that if the above bounden James T. Easton and James McMahon shall well and truly pay, or cause to be paid, unto the said the New York and Long Branch Railroad Company, Edward G. Brown, H. R. Campbell and J. B. Campbell, such damages as they, or any of them, may sustain by reason of the restraining part of said order, if the court shall eventually decide that the complainants were not equitably entitled to such restraining order, then the above obligation to be void, otherwise to remain in force."

Subsequently such proceedings were taken in this chancery suit that, upon argument, this restraining order was dissolved,

an injunction refused, and the bill dismissed. Thereupon this present suit was brought in the Supreme Court on the bond above described, and at the trial the plaintiff proved the instrument and the decree of the Chancellor dissolving the restraining order, refusing the injunction and dismissing the bill. Upon the case thus made the plaintiff was ordered to be called.

We are not possessed of the advantage of having the views of the judge before whom this case was tried, and therefore cannot be certain with respect to the ground on which this non-suit was ordered; but, from intimations in the briefs of counsel, I am led to conclude that it proceeded from the opinion that a forfeiture of the bond sued on could not be shown by simply proving that the Chancellor had decided that the complainants in the suit in equity were not, by the law and the fact, entitled to the restraining order at the time it was made, but that, in addition to this, it must appear that the application for such order was made in bad faith. This opinion seems to have been induced by the remarks of the court in the case of *Smith* v. *Kuhl*, 11 *C. E. Green* 98, in which it was said that these bonds are intended to secure *bona fides* in the application for the injunction, and to provide indemnity to the party enjoined against the effects of an injunction unfairly obtained. The question is, can this view be sustained?

The first and fundamental difficulty with which it is encountered, is that it cannot be made to harmonize with the language of the instrument in question. That language is plain and perfectly reasonable and intelligible, and is entirely unaffected by the context; and such language, existing in either a contract or in a rule of court, cannot be controlled or made to mean something that it does not import. The rule is universal that a court is not warranted in adding to or taking away anything from such language. The bond in question declares its own liability to forfeiture " if the court shall eventually decide that the complainants were not equitably entitled to such restraining order." This the court has decided, for it will hardly be pretended that the restraining

order would have been dissolved and the bill dismissed if the complainants were "equitably entitled" to it. It is consequently an obvious, and, as it seems to me, an indisputable addition of an extraneous matter to require that, to make this bond forfeited, *mala fides* in the application for the restraining order must be exhibited.

The instrumental condition calls for the existence of a single state of facts, viz., the absence of an equitable right to the restraining order; the proposed construction calls for the existence of two states of fact, viz., the absence of such equitable right, and *mala fides*. This latter term seems to me like the introduction of a pure interpolation into this condition, for it is certain that a man may not be equitably entitled to an injunction, no matter how honest his intentions and proceedings may be in applying for it. For example: a merchant is enjoined when about to ship his goods to a foreign part; the bill has been filed by a creditor for discovery, and the injunction obtained on the ground that the contemplated removal of the goods is in fraud of creditors; the discovery turns to the discomfiture of the complainant; he made his application in good faith, supposing that he was entitled to an injunction, but in point of fact he was not so entitled, as is manifested by the supposed defendant's answer. If, in such a case as this, a bond similar to the one in suit had been given, would its forfeiture be saved by the fact that the suit was instituted and carried on with an honest intention? It is impossible to say that justice would be served by such an interpretation, for there is surely no reason why the creditor, in the case put, should obtain his discovery at the expense of the unoffending defendant, but it is the better and, as I think, the conclusive objection to such an interpretation, to say that it will not square with the clear terms of the instrument to be construed.

Nor have I found that elsewhere in the practice of courts of equity, this limited effect has been given to these injunction bonds. It seems to have been the prevailing opinion that it is but common justice that the loss incident to preliminary in-

junctions, which are founded to some extent on decisions adverse to defendants before they are heard, should fall on the party seeking them, if, in the end, it appears he was in the wrong. Both parties being innocent of wrongful intention, he who occasions the loss should bear it. This is the rule at law and in equity, and is the dictate of natural justice.

The practice in the English courts has long been settled. The complainant is held on his bond, without any reference to his intention being good or bad. If he fails to sustain the equity of his bill he must pay the damages incurred. *Daniell's Chan. Prac.*

In *Novello* v. *Jones*, 31 *L. & Eq. Rep.* 280, a bond had been given on the continuance of an injunction, and the question arising as to its enforcement, Knight Bruce, L. J., said he would consider it unjust to the defendant " to disregard or not give effect to the undertaking, which *was the price* of the continuation of the injunction." And in the same case, Turner, L. J., expressed his views in these terms: " The plaintiff came upon a title at the time doubtful, there being conflicting decisions upon it by the superior courts of law, and therefore it was that in granting the injunction the court put the plaintiff on this undertaking; and the result having ultimately turned out unfavorable to the plaintiff, it seems to follow that it is the duty of the court to carry the undertaking into effect."

Thus the complainant was held on his bond, although there was no pretence of *mala fides,* his defeat being occasioned by the settlement against him of a doubtful question of law. Bonds having a similar scope are in frequent use on the equity side of several of the courts of this country, and I have failed to find any instance of an instrument of this kind being employed merely for the end of indemnifying the defendant against the evil consequences of the fraud or bad faith of the complainant.

There is also another consideration of much weight tending in the same direction. These bonds are taken in our practice by force of the forty sixth rule of the Court of Chancery. This rule is of long standing, and is substantially a copy of

one of the rules of practice of the old court of equity of the State of New York, and the obligations given by force of this original rule have been repeatedly construed by the courts within whose jurisdiction it prevailed.

In such adjudications it does not appear to have occurred to the mind of any judge that a decision eventually made to the effect that the complainant was destitute of a title to the equitable relief to which the injunction was ancillary, did not work a forfeiture of the bond without any regard to the question whether the complainant in applying for the writ had acted with candor and fairness.    There is quite a crowd of cases of this character which I will cite without other comment than the remark that they hold that, in the language of one of them, " the object of the rule was to afford to the party enjoined full and ample security for all damages he might sustain by reason of the allowance of an injunction against him, without giving him an opportunity to be heard in opposition to such allowance." *Leavitt* v. *Dabney*, 2 *Sween.* 617; *Cayuga Bridge Co.* v. *Magee*, 2 *Paige* 116; *Sullivan* v. *Judah*, 4 *Paige* 444; *Carroll* v. *Sand*, 10 *Paige* 298; *Edwards* v. *Bodine*, 11 *Paige* 223; *Loveland* v. *Burnham*, 1 *Barb. Ch.* 66; *Lawton* v. *Green*, 64 *N. Y.* 326.

This construction is, as I have already said, the only one that comports with the explicit terms of this class of instruments.    Nor does it appear that any practical objection can be made against such exposition of them, for they are entirely under the control of the Chancellor until he issues his order to put them in suit.    If the equity of any possible case should require such order to be withheld, it is within the discretion of the Chancellor to take such course.    But when the suit is permitted, and it is brought, a court of law can look only to the language of the instrument, in order to ascertain its legal effect, and must put it in force according to its terms.

In the present case, the decision of the Chancellor, finding that the complainant had no title to the equitable relief prayed for, and dismissing the application for injunction, the bill operated as a forfeiture of the bond, in the absence of all

evidence showing that such decree was founded on some fact which did not exist when the restraining order was granted; and the consequence is, that at the trial there should have been an assessment of damages founded on such forfeiture.

The judgment of the Supreme Court, I think, should be reversed.

THE CHANCELLOR, (dissenting.) Easton and McMahon, relators and complainants in the case of *Attorney General and others* v. *New York and Long Branch R. R. Co.*, 9 C. E. *Green* 49, were, on the granting of the order to show cause why an injunction should not be issued in that case, required to give bond to the defendants, with sufficient surety or sureties, in the penalty of $10,000, according to the forty sixth rule of the Court of Chancery ; the bond to be approved, as to form and sufficiency of sureties, by one of two special masters of that court therein named.

That rule provides that in cases where an injunction is granted *ex parte*, the Chancellor or master may, at his discretion, take from the complainant a bond to the party enjoined, in such sum as may be deemed sufficient, either with or without sureties, conditioned to pay to the party enjoined such damages as he may sustain by reason of the injunction, if the court shall eventually decide that the complainant was not equitably entitled to such injunction.

The bond was given. It recited that the Court of Chancery had granted the order to show cause with an *interim* restraining order, and it was conditioned that the complainants, Easton and McMahon, should well and truly pay, or cause to be paid to the defendants, such damages as they or any of them might sustain by reason of the restraining part of the order, if the court should eventually decide that the complainants were not equitably entitled to such restraining order.

The order to show cause was, after argument, discharged, the injunction denied and the bill dismissed. The provision for the ascertainment of the damages by the Court of Chancery was omitted from the condition of the bond. How this

omission occurred does not appear. It was not by direction or with the consent or acquiescence of the court, but probably through mistake of the person who drew the bond. After the discharge of the order, application was made, on the part of Brown and Campbell, two of the defendants, for the delivery of the bond to them, in order that they might prosecute upon it at law for the recovery of their damages by reason of the restraining part of the order. In view of the omission above referred to, the application was granted. *Easton and McMahon* v. *New York and Long Branch Railroad Co.*, 11 *C. E. Green* 359.

Suit was brought on the bond in the Supreme Court. At the trial, the plaintiffs proved that the injunction was denied, but made no further proof on that point. The justice who presided at the trial non-suited them, on the ground that they had not proved sufficient on that head to entitle them to judgment. In this he was clearly right, unless the mere fact of the refusal of the injunction of itself worked a forfeiture of the bond, and the obligors could not avail themselves of any excusatory facts or circumstances to protect them against the forfeiture.

The Vice Chancellor, in his opinion upon the application for delivery of the bond, said that the question whether the condition of the bond had been broken or not must be left to the judgment of the court in which the action on the bond was to be instituted, and that if the Court of Chancery had not, under that bond, power over the surety, it should not attempt, as against him, to adjudge whether a cause of action existed or not; that that should be left to the determination of the court of law. It appears that that court adopted the view of the Court of Chancery in *Smith* v. *Kuhl*, 11 *C. E. Green* 97, on the subject of the forfeiture of such bonds. The view there expressed was, that the object of the bond taken under the rule is to secure *bona fides* in the application for the injunction. The language of the court was: " The bond given under this rule is security only for damages, in case the complainant shall prove not to have been equitably enti-

tled to the injunction when he applied for it. That the in-junction was dissolved is not of itself evidence that he was not equitably entitled to it. And though it may have been improvidently granted, and for that cause be dissolved before answer, that will not, if the case be fairly presented by the bill and verification, entitle the defendant to whom it is given to look to it for damages. But if the action be actually or presumably *mala fide*, as for example, if the bill present grounds for relief by injunction which have no existence, or distort or falsely color facts, or omit facts in the knowledge of the complainant, or of which he might, and in fairness ought to have informed himself, and which would have had an important bearing against granting the injunction if stated in the bill; in short, if the application be disingenuous, *mala fide*, or made without due regard to the rights of the court or the defendant in the application, the complainant is not to be regarded as having been equitably entitled to the injunction. A complainant may come into court for a discovery, and on that ground pray an injunction. If the discovery be made, and the result be adverse to him, and the injunction therefore be dissolved, he may, nevertheless, have been equitably enti-tled to the injunction. The object of the rule is to secure *bona fides* in the application, and to provide indemnity to the party enjoined against the effects of an injunction unfairly obtained."

This view of the subject is opposed by the construction which was given to the rule in the State of New York, from which it was derived. There it was held that the obligor in the bond was liable if the injunction was dissolved, without regard to the question of *bona fides* in the application; that the bond was in fact an absolute undertaking that the injunc-tion should be sustained—an absolute undertaking that not only the court granting it, but the appellate tribunal should sustain it; that is, not only that the Chancellor who granted it should continue to the end to hold the same views in re-gard to the complainant's right to it which he held when he granted it, but that the Chancellors who succeeded him, and

who might pass upon the cause, should take the same view of it, both as to law and fact, which was taken by him, and that a majority of the members of the appellate tribunal should entertain such a view of the case as to sustain the injunction. It was urged, in the brief of the counsel of the plaintiffs in error, that the construction given to the rule in New York attaches to it authoritatively and controls its construction here. I am unwilling to concede this doctrine when applied to a rule of court.   The construction of our own courts upon any rule of their own must, with us, outweigh that of the court from which the rule was taken, and I think that the construction which has, in practice, been given to this rule in this state for the many years (more than twenty five) during which it has existed, is a far more important element in the adjudication than the construction which has been given to it by the courts of New York.   During all the time that the rule has been one of the regulations of the Court of Chancery of this state, up to the year 1875, there was no instance of even an application to the court for leave to prosecute, or for an ascertainment of damages under such a bond.   And yet there were many bonds taken under the rule on granting injunctions, and some of those injunctions were dissolved on bill alone, and very many after answer.   The fact that recourse was not had to the bonds for damages in any case, is conclusive evidence of the construction which was put upon the rule by the bar.   In 1875 the application in *Smith* v. *Martin*, *ubi supra*, the application in this case, and an application in *Green* v. *The Philadelphia Freestone and Granite Company*, 11 *C. E. Green* 443, were made.   In the last mentioned case, it may be remarked it was held that the bond was forfeited on the ground that the complainant, with full knowledge of the facts, misrepresented them in the bill, and there was a reference to a master to ascertain and report the defendant's damages.

It is hazarding nothing, I think, to say that a construction of these bonds which shall make the obligors absolute guarantors of the complainants' success in maintaining the injunc-

tion, will be a surprise to the bar. It surely will be so to the persons who have become sureties in these bonds. If it was intended by the framer of the rule to make the bond the means of indemnity to the person enjoined, in case of the dissolution of the injunction from any cause whatever, *quærente invito*, the language used was very inapt, to say the least of it. The condition of the bond is for the payment of such damages as the person enjoined may sustain by reason of the injunction, if the court shall eventually decide that the complainant was not equitably entitled to it. It will be perceived that the forfeiture is to arise, not if the court shall eventually decide that the complainant is not entitled to an injunction in the case, but that he was not equitably entitled to the preliminary injunction granted. The reference is to the preliminary injunction alone. Nor is it obvious why the court should have used the term "equitably" in that connection if it was not intended to have reference to the *bona fides* of the complainant in the application. The term was adopted by those who were acquainted with the exact meaning of words. In a court of equity he who obtains an injunction always obtains it because he is supposed to be *equitably* entitled to it. What, then, is the signification of the word "equitably," in the connection in which it is used in the rule, if it be not "fairly," unless, indeed, it is merely redundant?

In my opinion, a fair construction of the rule refers the obligation of the bond to the fairness of the application for an injunction at the time when it was made. If more is intended, a bond with a different condition should be required —one clearly and explicitly stating the liability which the complainant and his sureties are to incur. So long as relief by preliminary injunction is part of the remedies of our law, the complainant who shows himself by his bill to be entitled to it, is entitled to it at the hands of the judge, who is authorized to grant it merely on presenting a case which, in the judgment of the judge, warrants it; just as he is to the extraordinary remedy of the writ of *ne exeat*.

Said Chancellor Green, in *Flavell* v. *Dodd*, 2 *C. E. Green*

255, the application being for security against loss to the defendant by reason of the injunction, "Upon the case made by the bill, the right of the complainant is clear, and the infraction of that right established. Under such circumstances the fact that the injunction occasions a serious loss to the defendants affords no just ground of complaint." He did not, in that case, consider himself bound to require the complainant to guaranty by bond, either with or without surety, that the injunction should be maintained, or that it should eventually appear, even to the Chancellor himself, that the complainant was equitably entitled to it. The Chancellor may, indeed, if he sees fit to do so, require security, but his demand must be reasonable. He is not at liberty to impose conditions which amount to a denial of the relief. He cannot justly put upon the shoulders of the complainant the burden of the responsibility for the error in judgment of the court. No pecuniary responsibility arises to any one for those errors. Even the judge himself cannot be held to pecuniary responsibility for them. It is the right of the complainant to present his case, and it is the duty of the Chancellor to decide upon it. The complainant is entitled to the judgment of the court upon the case presented, and to the relief to which the court may adjudge him to be entitled thereon. And though injury ensue to the party enjoined in such case, it is to be put down to the same account as that which ofttimes attends appeals and the delay in deciding causes ; it is to be put down to the necessities of the administration of justice, against which no suitor is bound to indemnify his adversary. To require a complainant to furnish an indemnity to the defendant, amounting to a guaranty of eventual success of the former, at all events, before granting a preliminary injunction to restrain the latter, would, in very many cases, be equivalent to an absolute denial of justice. The destruction of the poor would indeed, in such case, be their poverty. The helpless would also be hopeless, and the friendless at the mercy of their oppressors. Nor is it any answer to say that the Chancellor may exercise his discretion in such cases, and re-

quire no bond where the complainant is unable to find one. He can exercise no discretion in such case but a judicial discretion, and the indemnity, if required, is taken for the protection of the party enjoined, who is as much entitled to it on the application of a poor person as on that of a person of wealth. To the rich even the requirement would often be equivalent to a denial of justice, for the best cause may be eventually lost by the death or absence of one of the complainant's witnesses, or other like accident. Indeed, it may be lost by the death, or even absence, of the complainant himself, or of his agent. There are many casualties which may deprive a worthy complainant of relief in a most meritorious cause, and insure to the defendant a most unrighteous triumph. The uncertainty of the law is not confined to the results of the deliberations of petit juries, but it not unfrequently arises from radical differences of opinion and views between courts equally learned, wise, painstaking and conscientious ; the final settlement of the question involved, the one way or the other, depending in such cases merely on the order in which the differing tribunals pass upon it.

These considerations incline me against any construction of the rule in question which will make the bond given under it a guaranty of more than the *bona fides* of the complainant in the presentation of his application for injunction. As has been already said, if the court shall, for any reason, deem the case a proper one for security for the final result, it is easy for it to say so, and to require a bond which shall expressly and explicitly state the obligation ; and in my judgment, that would be a better practice than to hold that the complainant and his sureties in the bond under the rule under consideration may, if the court deem it proper to do so, be held liable to the person enjoined for all damages up to the amount of the penalty of the bond occasioned by the injunction, without regard to the *bona fides* of the complainant.

It may be added, that to so construe the rule as to subject the bonds taken under it to a construction different from that which by common understanding has been put upon them (to

say nothing of the construction put upon them by the court by which, in the course of its practice, they were taken,) to hold that they impose a liability which it has not been hitherto supposed that they embraced, will cause no embarrassment in future practice, for not only would the construction put upon them in Smith v. Kuhl be conclusive as to all bonds taken under the rule since that decision, but the rule itself is, of course, subject to modification, alteration and repeal by the court which made it.    The question is only interesting in connection with bonds taken before that decision.

In the case in hand, how did it appear by the evidence that the complainants were not equitably entitled to the restraining order which they had obtained ?    The fact that the order to show cause was discharged did not establish it, and no further or other proof on that point was offered.    It had been decided, indeed, that they were not entitled to an injunction; but did that fact of itself establish the fact that they were not entitled to the *ad interim* restraining order, the stay of proceedings, until the matter of the propriety of granting an injunction could be heard ?    Surely, it did not.    It is to be borne in mind that the restraining order was merely *ad interim*, granted merely for the purpose of inquiry as to whether there should be a preliminary injunction or not.

There are cases in which it is but simple justice, no less to the defendant than to the complainant, that the defendant should be required to refrain from action until the court can determine whether the complainant will probably be entitled to relief against him.    In such case the *ad interim* stay is prudential merely.

In this case the question submitted to the court was the construction of an act of the legislature conferring a franchise, and it involved the construction of the grant itself.    The bill was filed by the attorney general at the relation of Easton and McMahon, and by the relators as complainants with him. Its object was to restrain the defendants from further proceeding in the erection of a bridge over the Raritan, between South Amboy and Perth Amboy, and for the removal of so

much of the structure as had been built. The application was for a preliminary injunction, which, as before remarked, was not granted. Had the defendants been permitted to proceed with their work pending the consideration of the application, and had the conclusion at which the court arrived been adverse to them, the action of the court in declining to stay the work in the meantime would have been the subject of complaint as well as of criticism. Whether, in such cases, the complainant should be required to indemnify the party enjoined against the loss caused by the *ad interim* stay, must depend on the circumstances, and it must depend on the *bona fides* of the application and on nothing else.

In this case there was nothing shown to the justice who tried the suit upon the bond from which he could adjudge that the application for an *ad interim* stay was not in all respects *bona fide*; nothing from which he could adjudge that the Court of Chancery had eventually decided that the complainants were not entitled to the restraining order. That the order was discharged, and the injunction refused and the bill afterwards dismissed, did not establish it. Neither the pleadings nor the affidavits in the cause were offered. Nothing but the order to show cause, the order denying the injunction, the decree of dismissal and the bond. Not even the order for the delivery of the bond for prosecution was offered. There was in fact nothing before the justice from which he could decide that the complainants were not equitably entitled to the restraining order when they obtained it, unless the bond was to be held to be an absolute undertaking that the Chancellor would grant the injunction. He did not so hold, and ought not to have held so. The non-suit, therefore, was proper.

It will not be out of place to add that the embarrassment in this case has arisen from the fact that the bond was sent to a court of law for prosecution. When the order that the bond be delivered for prosecution at law was made, the subject was *res nova*; the decision in *Wauters* v. *Van Vorst*, 1 *Stew.* 103, had not been made. In that case it was held substan-

tially that the Court of Chancery has power over bonds given in the course of practice therein ; and on the principle of that decision the order for delivery in this case would not have been made, but the subject of liability and consequent damages would have been disposed of in the Court of Chancery, notwithstanding the omission from the condition of the bond of the provision that the damages should be ascertained by that court. I am of opinion that the judgment should be affirmed.

REED, J., (dissenting.) I think that the plaintiff should have proven a distinct decree, made by the Chancellor in the equity suit in which this bond was given, to the effect that when the injunction was ordered in that suit the complainant was not equitably entitled to the same. As there was a failure to do this, I think the non-suit was right, and the judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, REED.    2.

*For reversal*—THE CHIEF JUSTICE, DIXON, SCUDDER, VAN SYCKEL, WOODHULL, CLEMENT, DODD, GREEN, LILLY, WALES.    10.