In the Matter of the Application of THE UNION FERRY COMPANY OF BROOKLYN to acquire Title to Lands.

The act of 1882 (Chap. 259, Laws of 1882), "to provide additional ferry slips and facilities in New York city, etc.," which authorizes the lessees of the ferries therein specified, to acquire, by proceedings *in invitum*, the right to use a pier and adjoining land under water specified therein, is not violative of the constitutional provision (State Const., art. 3, § 18), which prohibits the legislature from passing a private or local bill "granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever."

It makes no grant to any private corporation, association or individual, but simply delegates the right of eminent domain to the then lessees of the ferries, to be exercised for public purposes, the right acquired to pass to any subsequent lessee, and only to be used in the exercise of the ferry franchise granted by the city; such a delegation of power is not within the constitutional prohibition.

Nor does the act grant any *exclusive* privilege, immunity or franchise within the meaning of said provision. A special privilege or franchise is not necessarily exclusive, and the granting of it to a corporation is not prohibited so long as there is nothing to prevent similar grants to other corporations; the prohibition is against the grant of a right to exclude others from the exercise or enjoyment of a like privilege or franchise.

The cases illustrating the character of the privileges and franchises at which the constitutional prohibition was aimed, collated.

It is not a constitutional objection to said act that it does not require the lessee to establish the fact that the property proposed to be taken is necessary for ferry purposes. Where the use is clearly a public one, it is for the legislature to determine the necessity of the exercise of the right of eminent domain, and the extent to which it shall be carried.

The particular property, therefore, to be condemned may be pointed out by the legislature, and the courts may not review its action in this respect.

A designation, in the act delegating the power, of the particular property to be condemned, does not render the grant exclusive within the meaning of said constitutional prohibition; to come within it, the exclusion must result from the provisions of the grant, not from the inherent nature of the right granted.

The fact that said act (§ 1) declares that the pier authorized to be taken shall, after a date specified, be devoted and set apart for ferry purposes does not render the act unconstitutional as authorizing the taking of property without compensation, for the reason that before using the pier the lessees are required to acquire title, and to compensate the owners.

The legislature has the right to control the management and occupation of wharves in navigable rivers, even in the hands of private persons.

The form in which the power to exercise the right of eminent domain is conferred by the act, *i. e.*, directing title to be acquired "in the manner and by the proceedings provided by law for acquiring title to lands for railroad use," with certain specified exceptions, is sufficiently definite, as it must be deemed to have reference to the General Railroad Act, and is proper.

(Argued November 25, 1884; decided February 3, 1885.)

APPEAL from order of the General Term of the Supreme Court, in the first judicial department, made the first Monday

of March, 1884, which affirmed an order of Special Term, dismissing a petition of the petitioner above named, for the appointment of commissioners to appraise the compensation to be paid to the owners of pier No. 2, East river. (Reported below, 32 Hun, 82.)✓

The proceedings were institued under chapter 259, Laws of 1882.

*John E. Develin* for petitioner, appellant. The power over wharves, slips and piers in the city of New York, and the disposition of them in the interest of commerce, has existed and been exercised without challenge from the beginning of the government; formerly by the king through the royal governors, and afterward and now by the State, through the legislature. (Dongan and Montgomerie Charters, Valentine's Laws, 243, § 37; Laws of 1798, chap. 80; Laws of 1806, chap. 126; Laws of 1813, chap. 86; 2 Rev. Laws of 1813, 431, chap. 86, § 219; Gerard's Treat. on City Water Rights, 206–234; 1 Hoff. Treat. on the Estate and Rights of the Corporation, 207 *et seq. ;* Laws of 1857, chap. 763; Laws of 1851, chap. 261; Laws of 1867, chap. 945; Laws of 1882, chap. 276; Laws of 1883, chaps. 189–435.) Ferries — *i. e.,* the right to transport and collect compensation for the transportation of persons and merchandise over or across navigable waters within the State are franchises belonging to and conferrable only by, the Government on individuals or corporations. (R. S., part 1, chap. 16, tit. 2, § 1; 1 Rev. Stat. 526; *People* v. *Babcock,* 11 Wend. 586; *Benson* v. *Mayor, etc.,* 10 Barb. 223; *Davis* v. *Mayor, etc.,* 14 N. Y. 523; *Milhau* v. *Sharp,* 27 id. 619; Laws of 1882, chap. 259.) This pier, being private property, could be obtained for the purpose to which it was thus devoted and set apart, only by purchase or otherwise acquiring it with the consent of the owners, or by condemning the land by process of law. (State Const., art. 1, § 7.) This proceeding to acquire and the acquisition of title, thus required to be had and made, are of a public nature, and in putting the burden of the operation upon the lessees, the legislature made them its agent

to acquire title and hold the property for public use. This action by the legislature is valid. (*Beekman* v. *S. R. R. Co.*, 3 Paige, 73 ; *Bloodgood* v. *Mohawk, etc., R. R. Co.*, 18 Wend. 9 ; *Hayward* v. *Mayor, etc.*, 7 N. Y. 325 ; *B. & N. Y. R. R. Co.* v. *Brainard*, 9 id. 108 ; *In re Peter Townsend*, 39 id. 181 ; *Rensselaer, etc., R. R. Co.* v. *Davis*, 43 id. 142.) The provision in the act of 1882, authorizing the proceedings to acquire the title to the pier, etc., in the manner and by the proceedings provided by law for acquiring title to land for railroad use by railroad corporations, refers to and intends the law, as it is established by the General Railroad Act of 1850 (Chap. 140), as amended by various subsequent statutes. (Laws of 1860, chaps. 511, 513, 514, 515 ; Laws of 1861, chap. 106 ; Laws of 1862, chap. 96 ; Laws of 1863, chaps. 11, 198, 507, 510 ; Laws of 1864, chap. 172 ; Laws of 1865, chaps. 448, 536 ; Laws of 1866, chaps. 558, 671; Laws of 1867, chaps. 565, 662 ; Laws of 1868, chaps. 532, 582 ; Laws of 1869, chaps. 519, 580 ; Laws of 1870, chaps. 671, 774 ; Laws of 1871, chaps. 622, 886 ; Laws of 1872, chaps. 591, 863 ; Laws of 1873, chaps. 704, 705 ; Laws of 1874, chaps. 574, 634 ; Laws of 1878, chap. 148 ; Laws of 1881, chap. 141 ; Laws of 1884, chap. 261 ; *People* v. *Dayton*, 55 N. Y. 367 ; *People* v. *Home Ins. Co.*, 92 id. 328 ; Potter's Dwarris on Stat. 189.) The act of 1882 (Chap. 259) does not violate the constitutional provision that no act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or any part thereof, shall be applicable except by inserting said act. (*People, ex rel. Com'rs*, v. *Banks*, 67 N. Y. 568 ; *People* v. *Hayt*, 7 Hun, 39.) Nor does it violate the provision of article 3 of the Constitution, section 18, that no private or local bill shall be passed * * * * granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever. (Bacon's Abr., word "privilege;" Jacobs' Law Dict., word "privilege;" Worcester's Dict., word "privilege;" Crabb's Synon., word "privilege;" Bouvier's Law Dict., word "immunity;" Jacob's Law Dict.,

word "immunities;" Worcester's Dict., word "immunity;" Jacobs' Law Dict., word "franchise;" 2 Blackst. Comm. 37; *Milhau* v. *Mayor, etc.*, 27 N. Y. 619.) A statute will not be declared unconstitutional, except in a case where there is no rational doubt, and never under an implication, the conflict must be clear. All presumptions are in favor of its validity. (*People* v. *Supervisors of Orange*, 17 N. Y. 241; *People* v. *N. Y. C. R. R. Co.*, 24 id. 485; *People* v. *City of Rochester*, 50 id. 525.) The State may authorize the acquisition of land only temporarily necessary for the public. (*Nicoll* v. *N. Y. & E. R. R. Co.*, 12 N. Y. 121.) And the legislature may vary the use for which land has been acquired by a corporation. (*Albany* v. *N. R. R. Co.*, 24 N. Y. 345; *Heard* v. *Brooklyn*, 60 id. 242; Potter's Dwarris on Stat. 188; *Chapman* v. *Gates*, 54 N. Y. 132; *Hamersley* v. *Mayor, etc.*, 56 id. 533; *Rider* v. *Striker*, 63 id. 137.) The burden of proving that the facts stated in the petition are not true rests upon the objectors. An affidavit or answer is not sufficient for that purpose. (*Matter of N. Y. Bridge Co.*, 4 Hun, 635; *Darlington* v. *Mayor, etc.*, 31 N. Y. 164; *Heyward* v. *Mayor, etc.*, 7 id. 314.)

*George G. De Witt, Jr.*, for respondents, Robert and Ogden Goelet. Chapter 259 of the Laws of 1882 is in violation of article 3, section 17, of the Constitution of the State of New York, which provides that: "No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or any part thereof, shall be applicable, except by inserting it in such act." (*People, ex rel. Stevens*, v. *Hayt*, 7 Hun, 39; *People, ex rel. Com'rs*, v. *Banks*, 67 N. Y. 568; *Matter of Rochester Water Com'rs*, 2 N. Y. Week. Dig. 416; *Wells* v. *City of Brooklyn*, 14 Hun, 438; *Hathaway* v. *Tuttle*, 12 N. Y. Week. Dig. 240.) The act in question is violative of article 3, section 18, of the Constitution of the State, which provides as follows: "The legislature shall not pass a private or local bill in any of the following cases

\* \* \* \* granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever \* \* \* \*." (Ang. & Ames on Corp., § 32; *Matter of N. Y. El. R. R. Co.*, 70 N. Y. 327; *Matter of B., W. & N. R. R. Co.*, 75 id. 335.)

*Elbridge T. Gerry* for respondent Hannah G. Gerry. A land-owner cannot be disturbed in his possession until compensation has been paid or has at least been secured. (*People* v. *Hayden*, 6 Hill, 359; *Bloodgood* v. *Mohawk, etc., R. R. Co.*, 18 Wend. 9; *Strong* v. *Brooklyn*, 12 Hun, 453; Mills Em. Dom. 130–137; *Thompson* v. *Grand Gulf R. R. Co.*, 3 How. [Miss.] 240; *Pearson* v. *Johnson*, 54 Miss. 259; *Matter of Wall Street*, 17 Barb. 617.) The act of 1882 is a private and local bill. (*Matter of N. Y. El. R. R. Co.*, 70 N. Y. 327; *In re Brooklyn, W. & N. R. R. Co.*, 75 id. 335.) It grants to a private corporation an exclusive privilege. (Ang. & Ames on Corp., § 32; *N. Y. C. R. R. Co.* v. *Met. Gas-light Co.*, 63 N. Y. 326.) Private property can only be taken for a use which is exclusively public; and not for a use which is partly public and partly private. A ferry is not, in this sense, a public use. (*Matter of Albany St.*, 11 Wend. 148; *Matter of Deansville Cemetery Ass'n*, 66 N. Y. 569.) Under the Constitution an act providing for the condemnation of lands must be of a general character, available equally to all ferry corporations and leaving land-owners free to raise the question, and the courts free to decide, whether the corporation presenting any particular petition has been duly incorporated, and whether the lands it seeks to acquire are, under the circumstances, necessary for a public use. (*Matter of Deansville Cemetery Ass'n*, 66 N. Y. 569.) Unless the grounds for the necessity are incorporated in the act, it is unconstitutional. (*Carleton* v. *Darcy*, 46 Super. Ct. [J. & S.] 484.) The right of a lessee is substantive and is independent of changes of ownership of the thing. (*In Matter of Morgan, etc., R. R. Co.*, 32 La. Ann. 371.) The act of 1882 impairs also the rights of the mayor, aldermen and commonalty of the city of New York, the lessors of the present ferry,

claimed to be operated by this Brooklyn ferry company; the corporation of the city of New York not being made a party to these proceedings. (*Matter of Rochester Water Com'rs*, 66 N. Y. 413; *Brown* v. *C. & S. R. R. Co.*, 12 id. 486.) The act of 1882 is void, because it violates the provision of the Constitution of the United States, which declares: "The Congress shall have power * * * * to regulate commerce * * * *." (Const. of U. S., art. 1, § 8, subd. 3; *People* v. *Kelly*, 76 N. Y. 475; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Sinnot* v. *Davenport*, 22 How. 227; *United States* v. *Coombs*, 12 Pet. 72; *Pennsylvania* v. *W. & B. Bridge Co.*. 18 How. 421; *Gilman* v. *Philadelphia*, 3 Wall. 713.)

*Abrm. Van Santvoord* for S. M. Van Santvoord *et al.*, respondents. As no such subject as the grant of an exclusive privilege to the Union Ferry Company is expressed in the title of the act of 1882 it is invalid. (Const. of New York, § 16, art. 3.) The provision in the third section of the act of 1882, that the property sought to be acquired shall be taken and paid for by any future lessee of said ferry in the same manner that other property owned by the previous lessees is or has to be paid for on change of lessees of said ferries, is inoperative and void. (*People, ex rel. D., etc., R. R. Co.*, v. *Bachellor*, 53 N. Y. 128–140; *Taylor* v. *Porter*, 4 Hill, 140; *In re Deansville Cemetery Assn.*, 66 N. Y. 369; *People, ex rel. Manhattan Savings Institution*, v. *Otis*, 90 id. 48; *People, ex rel. City of Rochester*, v. *Briggs*, 50 id. 566; *In re Village of Middletown*, 82 id. 196, 202, 203.)

*John M. Martin* for Henrietta Martin, respondent. The provision in the third section, that the property sought to be acquired shall be taken and paid for by any future lessee of said ferry in the same manner that other property owned by the previous lessees is or has to be paid for on a change of lessees of said ferry is inoperative and void. The manner of taking and paying for the property is not stated anywhere in the act, nor any law referred to as fixing it. (*People, ex rel.*

*D.*, etc., *R. R. Co.*, v. *Bachellor*, 53 N. Y. 128–140 ; *Taylor* v. *Porter*, 4 Hill, 140 ; *In re Deansville Cemetery Assn.*, 66 N. Y. 569.) Depriving property of one of its essential attributes is depriving its owner of his property within said provision of the Constitution. (Const., § 6, art. 1; *People, ex rel. Manhattan Savings Bk.*, v. *Otis*, Ct. of App. 15 Weekly Dig. 305.) The provisions of the act are so connected together it cannot be presumed that the legislature would have passed one section without all the others. (*People, ex rel. City of Rochester*, v. *Briggs*, 50 N. Y. 566; *In re Village of Middletown*, 82 id. 196.)

RAPALLO, J. The order denying this application was sustained by the court at General Term on the ground that the act of 1882, chapter 259, contravened section 18 of article 3 of the Constitution of this State, which provides that the legislature shall not pass a private or local bill "granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever."

Passing for the moment the question whether the act of 1882 granted an exclusive privilege, immunity or franchise within the meaning of the constitutional prohibition, the question arises whether the grant in question was to a private corporation. It was certainly not made to the Union Ferry Company by name, nor does the object of the act purport to be to add to the privileges or franchises of that company. In case the company should, under the authority of the act, procure the condemnation of the property in question, it would not acquire the property as its own, but would hold it merely temporarily and could use it only under its lease from the city of New York of the ferry franchise. The newly-acquired property would become simply an addition to the ferry described in the act, which ferry is under the control of the city, and ·by it leased to the ferry company. On the expiration of its present lease this property would have to be surrendered to the city or to any subsequent lessee of the ferry. The company would have no power of disposition over it, but only the right to be paid

for it by the subsequent lessee of the city, as other property appertaining to the ferry has to be paid for on a change of lessees of the ferry.

All this appears from the act itself, and the general system upon which the ferries of the city of New York are established and conducted.

By the Montgomerie Charter, section 37, Valentine's Laws, 243, the ferries on both sides of the East river, and all other ferries then or thereafter to be erected and established all around Manhattan island, and the management and the rule of the same, were granted to the mayor, aldermen and commonalty of the city of New York. In *Costar* v. *Brush* (25 Wend. 628), it was held that under this provision of the charter, the corporation of the city possessed the same power in respect to the establishment of ferries across the East river, that before belonged to the crown or the legislature, and that the grant by the city to the lessees of the Fulton ferry of an exclusive privilege, by covenanting that the city would not, during the existence of the lease, permit any other ferry between New York and Brooklyn to the southward of the then ferry at Catharine slip, was fully within the municipal authority and binding upon the city and the public.

The charter of 1857 provided (§ 41) that all ferries should be leased by the city ; that all leases should be made to the highest bidder who would give adequate security ; that no lease should be for a longer period than ten years; that all ferry leases should be revocable by the common council for mismanagement or neglect to provide adequate accommodations, and that all persons acquiring any ferry lease or franchise should be required to purchase, at a fair appraised valuation, the boats, buildings and other property of the former lessees or grantees, actually necessary for the purpose of such ferry grant or franchise.

The charter of 1857 was repealed by the charter of 1873, and we are not informed by the briefs of counsel whether the provisions of section 41 have been re-enacted in any form, but this is, perhaps, not very material to the present discussion, for

by the provisions of the act of 1882 the property sought to be acquired is devoted, after its acquisition, exclusively to the purposes of additional ferry slip accommodations for the ferry in question. It cannot be used for any other purpose and is inseparably united to that ferry, and must pass with it to any subsequent lessee after the expiration or termination of the lease to the Union Ferry Company. All the rights of that company, except its right to compensation, terminate with its lease, and if the property should ever cease to be used for the accommodation of the ferry, it would, on general principles, revert to the original owners. But so long as it continues to be used for the purposes for which it is condemned, it remains under the control of the corporation of the city of New York.

The title of the act of 1882 is, " An act to provide additional ferry slips and facilities in New York city for the ferries running between Whitehall street in the city of New York and the city of Brooklyn." The power to acquire title to the additional slip is granted, not to the Union Ferry Company, but to " the lessees " of the designated ferry, whoever they may be. The name of the Union Ferry Company does not appear in the act, except as identifying the ferry as the one which was at the time being operated by the company named, and in a declaration that that company is not authorized to acquire the fee of any property owned by the city of New York. If the Union Ferry Company should not acquire the title during the term of its lease, any subsequent lessee of the ferry, whether a corporation or an individual, would become entitled to proceed under the act. Whoever might become lessee after the acquisition of the title would, under section 3 of the act, be entitled and required to take the property, and bound to pay his predecessor for it. And section 3 further provides that after the title to the property is acquired according to the provisions of the act, it shall be devoted to and used exclusively for the ferry slip accommodations mentioned.

The whole frame and context of the act are consistent with the view that its object was not to grant any privilege or franchise to the Union Ferry Company as a corporation, but, as

stated in the title of the act, to add to the ferry slips and facilities of the particular ferry which the company named was at the time operating. Such additional facilities would increase the capacity not only of that company, but of all future lessees of the ferry, to meet the wants of the public, but those increased facilities would be enjoyed by the Union Ferry Company only under its lease from the city. They would terminate with that lease and pass to the succeeding lessee. The property could not be used for any purpose except the exercise of the ferry franchise granted by the city, in whosesoever hands that franchise might, from time to time, be placed.

The authority to institute the proceedings might well have been conferred directly upon the corporation of the city of New York, but that would have involved the necessity of an advance by the city of the cost of obtaining the increased facilities. This necessity was obviated by selecting the lessees of the ferry, for the time being, as the agents through whom the power of eminent domain should be exercised, and they were not only empowered, but required, to perform that duty and incur the necessary outlay, being indemnified by the incidental advantage they would obtain in the increase of their facilities while their occupation should continue, and the reimbursement of their expenditure by being compensated for the property by the lessees who should succeed them.

It cannot be that the constitutional prohibition should be so construed as to deprive the city of New York of the power of increasing its ferry accommodations by the means provided in this act. Its ferries are under the control of the corporation of the city, in whom is vested the power of granting ferry franchises, and are operated under leases from the city. To hold that the accommodations of a particular ferry cannot be enlarged except by the acquisition by the city, in a direct proceeding by it, of the required addition, and that this duty cannot be devolved upon the lessee, or, what would be still worse, that such an authority could not be conferred upon the lessee of one ferry without conferring like authority upon every ferry

company in the State, would be giving to the constitutional provision an effect which never could have been intended. The General Ferry Act, under which the Union Ferry Company is stated to be incorporated, has, for good reasons, withheld from ferry companies formed under the act, the power of eminent domain. Special legislation was, therefore, indispensable to accomplish the end sought to be attained by the act of 1882, of enlarging the accommodations of the ferry in question. The constitutional provision could not have been intended to prohibit an act of this character.

For the reasons stated we do not regard the act as a grant to a private corporation; but even if it should be so considered, is it a grant of an "exclusive privilege, immunity or franchise?" It is not a grant of an immunity, and if it comes under either head, it must be that of a "privilege" or a "franchise." It is disputed by the appellants that the authority conferred by the act is even a "privilege," and it is claimed that it is merely an appointment of an agency to exercise the right of eminent domain for the benefit of the public. But, assuming that it is a privilege or a franchise granted to the Union Ferry Company as a private corporation, is it an "exclusive" privilege or franchise within the meaning of the Constitution? The constitutional prohibition was evidently aimed at monopolies. At granting to corporations or individuals not merely privileges and franchises not possessed by others, but the right to exclude others from the exercise or enjoyment of like privileges or franchises.

A special privilege or franchise is not necessarily "exclusive." The right of the patentee of an invention is "exclusive." So would be an act of the legislature which should attempt to confer upon a private corporation or individual the exclusive right to manufacture or vend any article of trade, and prohibit all other persons from competing in such business, or the exclusive franchise of operating a ferry or of maintaining a toll-bridge across a particular river, or of running stages on a highway, and prohibiting all others from competing, and the like.

But the grant of a particular power to a private corporation

is not " exclusive " simply because the same power is not possessed by other corporations, so long as there is nothing to prevent the granting of such power to any other corporation. The Constitution itself makes this distinction manifest. Article 8, section 1, provides for the formation of corporations under general laws, but prohibits their being created by special act, except for municipal purposes, " and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws." The legislature is thus left at liberty to determine in what cases special charters shall be granted, and the object of such a special charter must necessarily be to confer upon the corporation, powers or franchises not possessed by other corporations; otherwise there would be no need of creating them. But such special powers are not necessarily " exclusive." Special charters are still subject to the prohibition against granting " exclusive " franchises, and neither under a special charter or a general law could a corporation or class of corporations be vested with any privilege, immunity or franchise which is " exclusive" in the proper sense of the term.

The word " exclusive" is derived from " *ex*," out, and " *claudere*," to shut. An act does not grant an exclusive privilege or franchise unless it shuts out or excludes others from enjoying a similar privilege or franchise.

The most familiar instances of grants of exclusive privileges or franchises are to be found in acts authorizing the establishment of ferries, toll bridges, turnpikes, telegraph companies and the like, as in case of the charter of the Cayuga Bridge Company, which provided that it should not be lawful to erect any bridge or establish any ferry within three miles of the place where the bridge of the company should be erected, or to cross the river within three miles of the bridge without paying toll. (*Sprague* v. *Birdsall*, 2 Cow. 419 ; *Cayuga Bridge Co.* v. *Magee*, 2 Paige, 116 ; *New York State Bk.* v. *Fletcher*, 5 Wend. 85.) The charter of the Mohawk Bridge Company, which prohibited ferries across the river one mile above and one mile below the bridge. (*Mohawk Bridge Co.* v. *U. &*

*S. R. R. Co.*, 6 Paige, 554.)    The lease by the corporation
of the city of New York in 1814 of the Fulton ferry, in which
the corporation covenanted that it would not grant or permit
any other ferry to the southward of the ferry at Catharine slip.
(*Costar* v. *Brush*, 25 Wend. 628.)    The charter of the Dela-
aware Bridge Company, which prohibited the erection of any
other bridge, or the establishment of any ferry, within two
miles above or below. (*Chenango Bridge Co.* v. *Binghamton
Bridge Co.*, 27 N. Y. 87, and *S. C.*, 3 Wall. 51.)    The charter
of the West River Bridge Company, which granted the exclu-
sive privilege of maintaining a bridge across West river. (16
Vt. 446.)    The charter of the Boston and Lowell Railroad
Company, which provided that no other railroad should within
thirty years be authorized between Boston and Lowell, and
was held to be a contract protected by the Constitution, as in the
Binghamton bridge case.    (3 Wall. 51.)    The grant of an ex-
clusive right to a line of telegraph between Sacramento and
San Francisco, all other persons being prohibited from running
a line within one-half a mile, or doing business between those
cities.    (*California State Telegraph Co.* v. *Alta Telegraph
Co.*, 22 Cal. 398.)

These references illustrate the character of the privileges or
franchises at which the constitutional prohibition was aimed.
The delegation to a corporation of the power to acquire title
to land for public purposes is not a grant of an " exclusive "
privilege, for the same delegated power may be conferred upon
any corporation to whom the legislature may see fit to intrust
it, and where a corporation is organized under a general law
which does not delegate that power, there is nothing in the
Constitution which prevents the legislature from conferring it
in that particular case, if the needs of the public require it ;
and if the use is public, the legislature is the competent author-
ity to determine whether the property is needed for such use.
The legislature, as has been seen, has the power to grant special
charters where, in its judgment, the objects cannot be accom-
plished under general laws.    It might, therefore, grant a special
charter to a ferry company, where it was necessary to delegate

to such company the right of eminent domain, which it was not deemed expedient to delegate to all ferry companies. Having this power it cannot be said that it contravenes the Constitution, in accomplishing the same end, by delegating the right of eminent domain to an existing corporation organized under the general law.

It is urged, as a further objection to the constitutionality of the act of 1882, that it does not require the ferry company to establish the fact that the property proposed to be taken is necessary for the purposes of the ferry.

That objection is clearly untenable. Where the taking of private property, for a use claimed to be public, is authorized by the legislature, its determination of the public character of the use is not conclusive. The existence of the public use in any class of cases is a question reviewable by the courts. If, however, the use is certainly a public one, the legislature is the proper body to determine the necessity of the exercise of the right of eminent domain and the extent to which it shall be carried, and there is no restraint on the power save that of requiring that compensation be made. (Mills on Eminent Domain, chap. 2, § 11 ; *Brooklyn Park Com'rs* v. *Armstrong*, 45 N. Y. 234 ; *Secombe* v. *Milwaukee R. R. Co.*, 23 Wall. 108.) The particular property needed may be pointed out by the legislature, and the courts cannot review its determination in this respect. (Mills on Eminent Domain, § 11 ; *Giesy* v. *Cin., W. & Z. R. R. Co.*, 4 Ohio St. 308.) The public character of the use in the case before us is indisputable, and the determination of the legislature as to the necessity of the particular property is conclusive.

But it is contended that this designation of the particular piece of property to be condemned for the purposes of the ferry renders the grant of the privilege or authority exclusive, inasmuch as no one but the grantee of the power can take the same property. That, however, is not, in our judgment, the nature of the exclusiveness contemplated by the Constitution. The exclusiveness prohibited is one which is created by the

terms of the grant, not that which results from the nature of the property or right granted.

Where, from the nature of the case, it is impossible that the right or power should be possessed or employed by more than one party, and it is important to the public interest that it should exist and be exercised by some one, the State must necessarily have authority to select the grantee. In such a case the exclusiveness is not produced by the grant, but results from the nature of the thing granted, and to this extent every grant to a corporation or an individual, of the right to acquire real estate, is exclusive. Where a toll-bridge is authorized to be erected at a particular locality, the right to that particular bridge is necessarily exclusive. So of all lands acquired by a railroad company for depots, car yards, etc., their right to enjoy those lands is exclusive. The right of the owner of upland to fill out into waters of the State in front of his land is exclusive in respect to the particular property involved, though a similar right may be conferred upon every person owning lands similarly situated. There may be cases where a railroad could not be extended without passing through lands situated at its terminus, which were already devoted to a public use, and could not, therefore, be acquired for railroad purposes under the general law or without express authority from the legislature. Can it be contended that, however great the necessity for the extension, the legislature would have no power to grant such authority ; and yet the grant of power in such a case would be exclusive in the same sense as is the power to extend the facilities of the ferry in the case before us. We think that in all these cases the exclusion of others from the enjoyment of rights or privileges similar to those bestowed upon the particular grantee must, in order to come within the constitutional prohibition, result from the provisions of the grant and not from the inherent nature of the right granted.

The act of June 1, 1882, is further assailed on the ground that its first section declares that the pier in question shall after the 15th of June, 1882, be devoted and set apart for the purpose of additional ferry accommodations for the ferry in

question.   And it is contended that, although the title may not have been acquired by that time from the owners, yet they would, by the terms of the act, be precluded from the enjoyment of their property and its use for ordinary purposes, without having been in any manner compensated.

If this section stood alone there would be some foundation for the argument, but we think that, taking the whole act together, it will not bear the construction claimed.   The second section provides that, before using the pier, the lessees shall purchase the right to its use if they can agree with the owners. If unable to agree within sixty days from the passage of the act, the lessees may acquire title by proceedings *in invitum.* And the third section declares that when the title is thus acquired, the property shall *thereafter* be devoted *exclusively* to the purpose of ferry-slip accommodations for said ferry.

The meaning of the act is, as we understand it, that after the 15th of June, 1882, it shall be lawful to use the pier for ferry purposes, but before the lessees can so use it they must acquire title by purchase or otherwise.   Until they do acquire title the owners are not to be disturbed in their enjoyment or use of the property, but *after* the title is acquired, it is to be *exclusively* devoted to and used for the purposes of the ferry.   Before that time, there is nothing in the first section, when read in connection with the others, which precludes the owners from using the pier for purposes other than the ferry.   The pier is prospectively devoted and set apart for ferry purposes from the 15th of June, but not *exclusively* for those purposes until after the title shall have been acquired, and then the owners are to be compensated for the property as it stands at the time of instituting the proceeding to acquire it.

This prospective devotion of the property to ferry purposes, by the first section, would seem to be meaningless, were it not for the character of the property.   The wharves and piers of the city of New York are in many respects public, and even when owned by individuals are subject to regulations as to their use, by legislative enactments.   These regulations are very frequent and are changed from time to time as the inter-

ests of commerce require.    For instance, in respect to the very pier in question, by chapter 367 of the Laws of 1857, all the waters adjacent to the wharves, from the east side of pier No. 2, East river, to and including the east side of pier No. 9, were, from the 20th of March to the 20th of December in each year, set apart and reserved for the use of canal boats and barges, and the harbor-masters were empowered to prevent other vessels from entering the slips or lying at the wharves designated, when required for the boats and barges specified. By chapter 261 of the Laws of 1858, whenever the owners of wharves or slips on the East river or North river lease them to the proprietors of certain regular steamboat lines, such wharves and slips are directed to be kept for the exclusive accommodation of the steamboats of the lessees, as far as necessary for their business.    But that act is declared not to give any owners of the wharves or slips mentioned in the act of 1857, above cited, power to lease their wharves to steamboat lines.    By the law of 1867, chapter 945, the act of 1857 is substantially re-enacted as to the waters from the east side of pier No. 2 to the west side of pier No. 10, East river, and further power is given to the proprietors of the lines of canal boat and barges to erect derricks on the piers.

The right of the legislature thus to control the management and occupation of wharves in navigable rivers, even in the hands of private owners, is fully recognized in the case of *Vanderbilt* v. *Adams* (7 Cow. 349), and is held not to be an unconstitutional interference with private property.    In that case Vanderbilt was subjected to a fine for stationing his own steamboats at a wharf owned by him, in violation of the orders of one of the harbor-masters of New York.    It was considered that by the old charters of the city, the royal prerogative of government over the subject-matter, was granted to the mayor, aldermen and commonalty, and that when they conveyed a water-lot, their sovereignty, as to the subject-matter, was not gone.

By an act of 1882, chapter 276, passed June 3, 1882, two days after the act in controversy, the area of the waters devoted

to the use of canal boats was reduced so as to extend only from the west side of pier No. 3 to the east side of pier No. 8, thus liberating the premises now in question from its devotion to the use of canal boats.   But at the time the act in controversy was passed, it would not have been lawful for the ferry company, even if it had acquired title to the premises in question by voluntary conveyance, to use the slip in question for ferry purposes, or to exclude canal boats and barges, nor could it, without express authority of the legislature, have excluded the general public from the use of the slip, even after the privileges of the canal boats and barges had been taken away. Hence the necessity of providing that the slip might be devoted to ferry purposes, so that, as soon as the ferry company acquired the title, it might use the property.   But as has before been shown, the slip was devoted to no *exclusive* use, and the owners were not deprived of any of their rights, until after the acquisition of the title.   Nothing was intended to be taken from the owners, nor were they restricted in the use of their property until they received their just compensation, and if before the institution of the proceedings, they made any use of the property by which third parties acquired any interest therein, that interest would also have to be extinguished on making compensation.

Criticisms are made upon the form in which the authority to exercise the power of eminent domain is conferred.   The language of the act of 1882 is that the lessees shall acquire title to the property "in the manner and by the proceedings provided by law for acquiring title to lands for railroad use by railroad corporations, so far as the same are applicable thereto," excepting that certain allegations which the general railroad law requires to be contained in the petition respecting stock subscriptions, surveys, maps, etc., may be omitted.

The objection that this reference is indefinite does not strike us with any force.   The act is in a stereotyped form adopted in almost innumerable statutes, where the power of eminent domain is intended to be delegated to a corporation, and by long use it must have acquired a definite meaning.   It can

refer to nothing else than the general railroad law. The criticism is that it might have been intended to refer to the law of 1875 for the construction and operation of steam railways in the counties of this State. That construction is quite inadmissible. The reference to the law for acquiring title to lands for railroad use must be deemed to have in view the general law, and not a law applicable only to a specific class of railroads. If any special indication of intention were required, it would be found in the fact that the allegations, which, by the act of 1882, the applicants are authorized to omit from their petition, are required by the general railroad law and are not required by the act of 1875.

The objection that this reference to the general railroad law to regulate the mode of procedure for acquiring title contravenes section 17 of article 3 of the Constitution, is met by the decision of this court in the case of *People, ex rel.* v. *Banks*, (67 N. Y. 568, 575.)

The orders of the General and Special Terms should be reversed, and the proceedings remitted to the Special Term to appoint commissioners.

All concur.

Ordered accordingly.