(16 Misc. Rep. 420.)

### GORDON v. STRONG et al.

(Supreme Court, Special Term, Kings County. March 6, 1896.)  ·

1. BRIDGE COMMISSION—CONTRACTS—RIGHTS WHICH IT MAY PURCHASE.

Laws 1895, c. 789, § 5, provided for appointment of a commission to build a bridge from Brooklyn to New York, and empowered the commissioners to purchase the "charter and all the powers and rights granted thereby" of any corporation having a valid charter to construct such a bridge, "so far as the same relate to the bridge authorized" by the act. *Held* that, the commissioners having located the line of their bridge so that it would interfere with the line which a corporation, having a charter to construct two bridges between the cities, had selected for one of its bridges, could purchase the corporation's rights as to such bridge, but that the company, not having located the line for its other bridge, had no rights in respect thereto which the commissioners could contract to pay it for, merely because the bridge located by the commissioners would extend slightly within the wide space within which the company was given the right to locate the other bridge.

2. SAME—CONSIDERATION.

While the commissioners may contract to pay the bridge company for its franchise any sum not so large as to be a fraud in itself, it cannot, in consideration of the franchise, agree, in addition to paying it $200,000, to construct on the bridge a space for elevated railroads, and give it the exclusive use thereof,—a right worth millions of dollars.

Action by William Gordon against William L. Strong and others, commissioners, under Laws 1895, c. 789, for injunction. Granted.

Francis R. Whitney, for plaintiff.

G. W. Wingate, for defendant East River Bridge Co.

William G. Choate and Henry C. M. Ingraham, for defendant commissioners.

GAYNOR, J. By act chapter 101 of the Laws of 1892 the legislature made Frederick Uhlman and other individuals a body corporate, and gave away to such corporation a franchise (viz. a permission or right) to build two bridges across the East river from Brooklyn to New York. Instead of precisely locating the line of the bridges, the act provided that the first bridge might be built anywhere "between a point at or near Broadway, in the city of Brooklyn, across the East river to a point or place between Delancey and Rivington streets in the city of New York"; and the second one from anywhere between Bridge and Little streets in Brooklyn to anywhere between Jackson and Scannell streets in New York. Each of these two spaces is wide enough for several bridges. The act required that the construction of the first bridge should be begun within one year after the assent of the federal government thereto, and of the second bridge within one year after the opening of the first to public use. The first one may be called the "Williamsburgh Bridge," and the second the "Hudson Avenue Bridge," for convenience of reference. The line of the

Williamsburgh bridge was actually selected and established, and the assent of the federal authorities to the plan of the said bridge was obtained in February, 1893. Nothing was done within the prescribed year thereafter, or has been done since, in the actual work of construction of the first bridge, unless the purchase of a small lot of ground in the line of the Brooklyn approach, and the setting therein of a cement foundation 5 feet deep and $4\frac{1}{2}$ feet square, in February, 1894, was a commencement of such construction in good faith, and not a mere pretense upon which to make a claim that the company complied with the requirement of the statute, and saved its charter from forfeiture. But inquiry into that subject is not necessary, as the charter could be declared forfeited only in an action brought by the attorney general of the state for that purpose. Such was the status of the company when the legislature, by act chapter 789 of the Laws of 1895, provided for the appointment of a commission to build a bridge over the East river by the two cities jointly. The act required that the bridge should run "from at or near the foot of Broadway" in Brooklyn, "to at or near the foot of Grand street" in the city of New York. By section 5 of this act the commissioners were empowered to acquire by purchase the "charter and all the powers and rights granted thereby" of any corporation having a valid charter to construct such a bridge as the said act authorized the commissioners to construct, provided the mayors of the two cities assented to such purchase. That the commissioners could have selected a line for their bridge which would not encroach upon either of the said spaces within which the said company was authorized to build its two bridges is not disputed, but for alleged reasons of expense and public accommodation they so located it that the Brooklyn end of it is against the approach to the company's Williamsburgh bridge, and the New York end goes to a small extent over the north line of the said wide space within which the company was authorized to build its Hudson Avenue bridge. They thereupon, with the assent of the two mayors, entered into an agreement with the company to purchase its entire franchise for its Williamsburgh bridge, but not its franchise to build the Hudson Avenue bridge, but only the right to encroach as aforesaid upon the space within the limits of which it was given the right to locate, but never did locate it. Thus is left with the company its franchise for the Hudson Avenue bridge. Nor is its said lot of real estate and foundation, or any other property, included in the purchase. The money consideration is $200,000. In addition to this large sum, however, the agreement contains a provision the value of which, if it be valid, and means what it was obviously intended to accomplish, must be worth many millions of dollars. It is as follows:

"It is also expressly understood and agreed between the parties aforesaid that the bridge to be constructed by the parties of the second part (the commissioners of the two cities) across the East river under and in pursuance of chapter 789 of the Laws of 1895 shall, among other features, contain the following: Space for two separate and independent railroad tracks for the use exclusively of elevated railroads, with gradients to be determined by the parties of the second part or their successors to be practicable and consistent with the motive power which shall be in use by such railroads at the time said bridge

shall be completed, and that said bridge shall have suitable and ample terminal facilities for such railroads, which facilities need not, however, extend beyond the approaches of the bridge as the same shall be laid out and established by the parties of the second part."

The plaintiff, a taxpayer of the city of Brooklyn, complains that the making of this agreement was an illegal, and also a fraudulent, official act, and that the carrying out of it would be a fraudulent waste of the public funds and estate, and prays that the commissioners be enjoined from carrying it out, and that it be annulled.

This case presents one of those instances, grown so common in this country, of the aggrandizement by law of a few at the expense of all. Public franchises, the property of the people, instead of being used and controlled for the public welfare and economy, are allowed to be bonded and stocked and exploited for the amassing of vast unearned fortunes out of the people. The holders of such franchises are permitted to use and abuse them as though the public had no rights in them. To meet the case of dividends or gains upon actual investments under them growing larger, owing to the value of the franchises themselves, than the public should in justice and good conscience pay, fictitious and fraudulent paper shares are issued upon them, in order to continue the unjust exactions. Surface and elevated street railroads, which would easily pay the liberal dividends which no one would begrudge upon their actual cost, not to say twice their cost, at a fare of two or three cents, are permitted to thus increase their paper shares, and their bonds also, indefinitely, instead of reducing the fares; thereby actually levying a tribute upon the public by means of and through public franchises given away to them and held by them for public purposes, instead of paying the public for the use of them, either in a fixed rent, or in reduced fares. The present case exhibits only another way of getting unearned money out of the public by means of public franchises. It presents the all too common instance of government giving away a valuable franchise, the property of all the people, with one hand, and buying it back out of the people's money with the other hand. Such an order of things is not government for the weal of all, but a form of socialism for the benefit of a few at the expense of the many, from which far more is to be feared to the permanency of government than from the perverse few who profess, or are said to profess, opposition to all government. The just discontent and demoralization of honest effort and industry, and the danger to the permanency of social order, caused by such a state of things, is a legitimate subject of argument before a court, and is entitled to have its legitimate influence; though a court is not permitted to be controlled by such considerations, however strongly urged, against what is the law, but must decide according to law. It is grave subject for statesmen, and those having to do with originating policies and the making of the laws.

The said statute under which the commissioners act gives them the power and discretion to purchase the franchise of the bridge company, but in terms only "so far as the same relates to the bridge authorized" thereby. This means that the commissioners may purchase such franchise or right as the company has, but only if, in

their judgment and discretion, necessary to the location of their bridge. The commissioners were under no necessity to encroach upon the bridge company. They were free to say to it: "We want nothing from you. There is plenty of room for bridges. You go and build yours (if you ever intended to), and we will build ours." There is room for many bridges across the East river, and the act does not prevent the company from building its bridges, though it may have been chiefly intended and fashioned to enable them to sell out. It provides for the taking of the company's rights only to the extent that they may be found in the way of the line to be selected by the commissioners. Under recent decisions this court has no power to interfere with the exercise of such discretion by the commissioners, however unwise or extravagant it may seem to be, unless the act of the commissioners be beyond their powers, or actually fraudulent. Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263; Adamson v. Railroad Co., 89 Hun, 261, 34 N. Y. Supp. 1073. They are given the power to locate their bridge upon the line selected by the company for its said first bridge, if they see fit, instead of upon the ample free space open to them, and upon which there is room for several bridges. It may well be that the people of the two cities would prefer to incur an extra expense of millions of dollars in building a bridge that would not trench upon the franchises of the said company, rather than submit to the payment of any amount of their money, however small, to buy back a mere permission to build a bridge, which their representatives gave away in 1892. But the complete answer to that in law is that the legislature has vested these commissioners with the power and discretion to locate the bridge of the two cities upon the said line of the company's proposed bridge, if they see fit, and then to purchase the company's franchise out of the public funds; and there this court has to stand. And the price or consideration to be given is also left to their discretion, and this court may not gainsay them in that, either, unless that they have agreed upon is so large and improvident as to be a fraud in itself.

As has been seen, the company had actually selected a line for its Williamsburgh bridge, and therefore had it by possession; and the commissioners, having, as has been seen, located the line of their bridge partly on it, had the right to purchase the company's franchise to it. But the commissioners have gone further than to purchase the franchise of the company to build that bridge. As is expressed in the said agreement which they have entered into, they have also purchased the right to have the New York end of their bridge go to some extent over the north line of the wide space within which the company by its said act of incorporation is given the right to locate its Hudson Avenue bridge. But it never has located it, and therefore it has no exclusive right to any particular line or part of said space. Having, therefore, no exclusive right there against the commissioners, it had nothing there which the commissioners needed, and could therefore use the public funds to buy; and to so use such funds would be an illegal waste thereof. The legislature gave the

company no specified or located line, but only the right to locate its line anywhere within such designated space.    Not having located it, it has no exclusive right.    Our state constitution expressly prohibits the legislature from "granting to any private corporation, association, or individual any exclusive privilege, immunity, or franchise whatever."    Article 3, § 18.    The legislature had not the power to grant to the said company an exclusive franchise to build and maintain a bridge or bridges over the East river, or any section of it.    It had the power to grant to it a franchise to build a bridge upon a line located and designated in the act itself, or within a given space or section of the river upon a line to be located and pre-empted by the company.    The line, when located in either way, would be exclusive, it is true, but not because the legislature did or could make it so, but only because it would be physically exclusive, in that two bodies are unable to occupy the same space at the same time.    If, for instance, the legislature should allow two companies to establish ferries, without designating the exact lines, the company which first legally located a line would have it exclusively; and the same is true of railroad companies in designating their lines by the filing of maps under the statute.    In re Union Ferry Co., 98 N. Y. 139; Rochester, H. & L. R. Co. v. New York, L. E. &. W. R. Co., 110 N. Y. 128, 17 N. E. 680; Suburban Rapid-Transit Co. v. City of New York, 128 N. Y. 510, 28 N. E. 525.    The bridge company having, therefore, established no right exclusive of the commissioners in the territory within the lines of which it was given the right to locate the Hudson Avenue bridge, the portion of the $200,000 which is the consideration for the purchase of a right in that territory is an expenditure for nothing, and hence an illegal waste of the public funds; and, as the agreement does not disclose what that portion is, so that its payment can be restrained, the agreement as a whole must be annulled.

In addition to this, the particular clause above cited of the agreement of purchase involves the case in much difficulty.    I refer to the clause in which the commissioners agree with the company that the completed bridge shall contain "space for two separate and independent railroad tracks, for the use exclusively of elevated railroads."    Why was this put in the agreement?    What does it mean?    For whose benefit is it intended?    Who is to come forward hereafter and assert rights under it, and what is to be its interpretation?    I have tried to discover and penetrate the design of the parties in putting this clause in the agreement, for surely their astute intelligence did not combine to put it there for nothing.    Upon the argument it seemed to me that it was not binding, but useless and harmless, as was claimed, for I could not see that the bridge company had, or could have in the future, any interest in it, and therefore it could never have any standing in court to enforce it; nor could I see that any elevated railroad company could enforce it, no such company being a party to the agreement or in privity with it.    It is true that the individuals who control the bridge company also control the only elevated railroad company which approaches the site of

the proposed bridge, as was freely admitted upon the argument; but that fact does not in law make such railroad company a privy to the said agreement. But upon a close inspection of the said act incorporating the bridge company, I find that said company is given the power to merge or consolidate with elevated railroad corporations, and thus participate in the ownership and operation of elevated railroads. Laws 1892, c. 101, § 8. I also find in the said act a provision that nothing therein contained shall be construed "as exempting from taxation the structure of any elevated railroad owned, controlled, managed, or operated" by the bridge company, which implies that it is empowered to become the owner or lessee of elevated railroads. Section 20. I also find that the bridge company's stock may be bought and held by elevated railroad companies. Section 7. These provisions reveal the design of the clause of the agreement under consideration. That the bridge company is, or is capable of hereafter being, associated with elevated railroad companies, or in control of elevated railroads, constitutes an interest in the said company in the said clause sufficient to make it live and binding, instead of a mere waste of words, incapable of binding the commissioners, or those who shall have control of the completed bridge. This clause must, therefore, be interpreted and recognized as an agreement by the commissioners that they will provide space for two independent railroad tracks for the use exclusively of the elevated roads owned and controlled, or to be owned and controlled, by the bridge company, or in which it has or may have an interest. It is noticeable that there is no requirement in this clause that elevated railroads shall pay anything for the space which it is thus agreed shall be provided for their exclusive use. If it was meant that they should pay, would it not be so provided? The agreement is complete in itself, the consideration for the purchase being the payment of $200,-000, and the furnishing of the space for the exclusive use of elevated railroads. It cannot be understood from this agreement that such space was to be paid for by the bridge company or its elevated railroads, for it is not being purchased or hired by this agreement; on the contrary, it is being given as a consideration for the sale of the franchise. It therefore all comes to this, viz.: That whereas those in control of the bridge company obtained from the legislature a franchise to build a bridge (intending chiefly to make it a railroad bridge on account of their control of elevated railroads), they are now by this agreement to be paid $200,000 of the public funds for not building the bridge, and, in addition, after a bridge shall be built out of the public funds, they are to be given the exclusive use of the space upon it for elevated railroad tracks. They build no bridge, but they are to have a railroad bridge worth many millions, and also $200,000, at the public expense. To say that this total consideration amounts to twenty millions of dollars would be within bounds. I recognize that the statute has vested the commissioners with a large discretion, but I cannot believe that this scheme is lawful or tolerable. If it is to be held such, it should be by a greater responsibility than that of a single judge.

This same clause also provides that the completed bridge "shall have suitable and ample terminal facilities for such railroads, which facilities need not, however, extend beyond the approaches of the bridge." This adroit provision plainly is that the commissioners are, at public expense, to furnish these elevated railroads with terminal facilities inside of and upon the bridge approaches. I cannot bring myself to disregard this, either, by yielding to the suggestion that it has no binding force. Did the able and astute parties to the agreement draw it with precision and care to bind no one and mean nothing? It must also be noticed that this provision makes clear the prior provision in respect of the railroad space upon the bridge, for, if the one is held to secure terminal stations for railroads at public expense, and without charge to them, it cannot be said that the other in like manner does not secure such bridge space. But if this clause be really not binding upon the commissioners, it was nevertheless an illegal breach of duty upon their part to put it in the agreement; for it is beyond doubt, to any one of discernment, that the design is at least to use it in the future as a basis for a claim that elevated railroads may be run over the bridge and have such terminal stations, without rent or charge, the outcome of which would almost certainly be to the public loss, either by a full yielding of their rights, or a compromise. To furnish color or basis for such a claim and controversy (as this clause does) is in itself a breach of official trust by the commissioners. It is more of a breach of duty in public agents than it would be in a private agent. If this clause be allowed to stand in this agreement, time will show that it was not purposeless. It is fraught with the intention to get for nothing at the public expense rights and property of immense value. The said commissioners are to build the bridge, but are not to have the management of the completed bridge. On the contrary, the act provides that it shall be turned over to the trustees of the old bridge now in operation, viz. the New York and Brooklyn Bridge. But in the section of the act which enables the commissioners to buy the franchise of the bridge company, is the following:

"But nothing in this act contained shall prevent said commissioners in their discretion from contracting with any corporation to operate a railroad across said bridge if said commissioners shall determine it to be in the public interest." Laws 1895, c. 789, § 5.

This is a strange proviso. Inasmuch as the act nowhere, in word or inference, pretends to confer any such power upon the commissioners, this proviso was obviously interpolated with the view of conferring it upon them. That they should do so is contrary to the plain scheme of the act, which was to make them only the builders of the bridge. But it is not necessary to decide whether this proviso enabled them to do so, for the particular clause of the agreement which has been discussed is not a contract for the operation of a railroad across the bridge. Such a contract would have to prescribe the terms under which the railroad would be operated, namely, the accommodation to be furnished, the rate of fare, the rent to be paid, and the like; so that, if we refer the said clause to the authority of

this proviso, it is not in compliance with it, and is therefore illegal. Its improvidence alone is sufficient to avoid it. The said bridge company's act provides for so-called "elevated railroad approaches" to the bridge extending across New York City to the Hudson river. The plain object was to enable the company to build elevated railroads in New York City, disguised under the name of the bridge approaches. This is fully revealed by the accompanying act (Laws 1892, c. 102), passed the same day, providing for the building of these so-called "approaches" by the bridge company under the rapid-transit railroad act of 1891, for its passage was wholly unnecessary, except in the view that the bridge act was violative of the prohibition of the state constitution against any private or local bill granting the right to lay railroads. Article 3, § 18. Much was said upon the argument of the work done and expense incurred by the bridge company in trying to get the local consents for the building of such elevated railroads in New York City. It is enough to say that this was not work and expense in the construction of the bridge, but in the said railroad scheme, which, if carried out, would have been of equal value, no matter who built the bridge. These so-called "railroad approaches" from the Hudson river and other distant points were in no sense parts of the bridge. That money was spent in them is no reason whatever that it should be reimbursed out of the public treasury.

Let an injunction be granted to continue until the trial of the action, or until the agreement of purchase be modified so that the purchase price will be for the franchise of the Williamsburgh bridge only, and by striking out the clause concerning the elevated railroads. The claim that the said clause is nugatory, and binds no one, will, of course, insure the striking out of that clause at once, for any opposition would be inconsistent with the good faith of such claim.